### UNITED STATES of America

### v.

### Mark COHN and Four Star Financial Services, LLC

### No. CRIM. AMD 01-0374.

United States District Court,
D. Maryland.

Oct. 7, 2003.

Joyce K. McDonald, Stephen M. Schenning, Office of the United States Attorney, Baltimore, MD, for United States of America.

Christopher Michael Davis, Davis and Davis, W. Neil Eggleston, Howrey, Simon, Arnold and White LLP, Washington, DC, Howard R. Price, Law Office of Howard R. Price, Beverly Hills, CA, for Mark Cohn.

Max Higgins Lauten, Kramon and Graham, Baltimore, MD, for Four Star Financial Services, LLC.

## MEMORANDUM OPINION

DAVIS, District Judge.

After several weeks of trial before a jury, Four Star Financial Services, LLC ("Four Star"), and its Executive Vice President/General Counsel, Mark Cohn, Esquire ("Cohn"), were on June 12, 2003, convicted of multiple counts of mail fraud and wire fraud and a single count of conspiracy to commit mail fraud and wire fraud. The charges arose from defendants' participation in a nationwide fraudulent telemarketing program in operation from 1999 through 2001. As explained below, in the midst of trial, I rejected Four Star's reliance on the attorney-client privilege in its attempt to bar the government from obtaining documents from Four Star and the testimony of a former Four Star in-house lawyer. This opinion elucidates the reasons for my ruling.

### I.

A brief overview of this prosecution will place the attorney-client privilege issue in perspective. Four Star operates as a high-return investment vehicle whose business plan consists of, in substantial part, funding high- and moderate-risk loans to a range of businesses. Four Star maintains offices in Los Angeles and South San Francisco, California, where Cohn worked.

In addition to Cohn (who was Executive Vice President and General Counsel), two attorneys, Stacy Pompei, Esq., and Nancy Ozimek, Esq., worked at Four Star during the period covered by the indictment. The three of them constituted Four Star's "legal department."

Cohn (through Four Star) and a man named Joel Katz had a business relationship for many years, in consequence of which Katz owed Four Star a significant sum. Thus, starting in or about 1999, in order to enable Katz to repay an outstanding indebtedness to Four Star amounting to millions of dollars, Four Star agreed to provide financing to Katz (who is a co-defendant in this case but was tried separately) to fund a telemarketing program. Over the years, the telemarketing program was called, variously, "The Money Club," "The Tele–Money Club," "Smart Savers Club," "Cash Card Club," "Cash Card Express" or "National Consumers Benefits Club." Under the program, telemarketing representatives working out of call rooms located throughout the United States (including Baltimore, where Katz was headquartered) would contact targeted consumers by phone, employing high-speed computerized phone dialers. The targeted consumers were individuals known to have credit problems, and consisted of significant numbers of older persons. Employing written scripts prepared by Katz and others, the telemarketing representatives told consumers, *inter alia*, that for a price between a low of about $49.95 and a high of about $199.95, they would receive a credit card, coupons and discounts, and other benefits as a "member" of "the club." Payments from those agreeing to participate were processed through electronic funds withdrawals from consumers' checking and savings accounts. In fact, the various programs were fraudu-

lent in design and in execution; the actual packages (termed, in industry parlance, "fulfillment packages") sent to purchasers (when anything at all was sent) contained few items of actual value, including a list of banks where consumers could *apply* for a credit card. In or about February 2000, after Cohn learned that Katz was diverting revenue from the scheme to his own uses, Cohn terminated the Four Star/Katz arrangement and caused Four Star to assume active operation of the telemarketing program, both in-house at Four Star and through shell corporations that were effectively Four Star subsidiaries. The government contends that, in total, the telemarketing scheme defrauded more than 31,000 consumers of more $3.6 million.

Over the course of the government's investigation of the scheme, Four Star produced numerous documents in response to a grand jury subpoena, covering the period from June 1999 through early 2001. Many of those documents included large numbers of hard copies of e-mails authored by or received by members of the Four Star "legal department," including Cohn and the two attorneys he supervised, Pompei and Ozimek. Nevertheless, Four Star also provided the government with a privilege log, in which it identified potentially responsive documents that were not produced, based on attorney-client privilege or work product privilege. In short, Four Star apparently purported to make a limited waiver of its attorney-client privilege in responding to the subpoena. The government expressed continuing concern, as trial approached, that Four Star was inappropriately withholding or failing to produce documents that should have been produced. Partly to allay this concern, the government served Four Star with a trial subpoena, which in significant part duplicated the grand jury subpoenas that had previously been served on Four Star, but which also sought additional documents.

Four Star produced additional documents on the eve of trial, some of them under a tight deadline which I imposed.

On or about May 12, 2003, after the jury had been empaneled and trial had commenced, the government filed a motion in which it asserted, *inter alia*, that Four Star and/or Cohn were impeding its ability to call as a witness Stacy Pompei, one of Four Star's former in-house lawyers and a former Cohn subordinate. Specifically, the government moved to compel Pompei's testimony. Four Star filed an opposition to the motion on May 15, 2003, arguing that a residuum of its attorney-client privilege barred the government from calling Pompei as a witness and asserting, further, that Pompei had an independent "duty of confidentiality" under California law which arguably prohibited her testimony. Finally, Four Star argued that, in any event, the government was not entitled to meet privately with Pompei outside the presence of Four Star's counsel. Four Star also sought the return of an e-mail it had produced on the eve of trial that had been authored by Pompei, insisting that the e-mail had been turned over inadvertently.

On May 16, 2003, I held a hearing during which the government, Four Star and Pompei (both by counsel and personally) were heard. It became clear to me that Pompei was perfectly willing to meet with government counsel and the investigating agents so long as doing so did not violate any independent duty owed to Four Star. I directed Four Star to provide me with a detailed list of the areas, topics, questions, time periods, and/or subject matter that Four Star contended were covered by any subsisting attorney-client privilege and to explain what, if any, "duty of confidentiality" Pompei had under California law that survived any waiver of the attorney-client privilege. Four Star's response, dated

May 20, 2003, invoked the attorney-client privilege over a broad range of matters.

On May 21, 2003, in an oral opinion, I rejected Four Star's assertion that it retained any attorney-client privilege in respect to contemporaneous communications related to the telemarketing program (however it might be denominated from time-to-time) which was the subject of the indictment. I entered an order finding and concluding as follows:

(1) In respect to the operation of [the Four Star] telemarketing program ... the "legal department" and defendant Cohn participated fully and regularly in the day-to-day operational and business-decision making, making no substantial effort to preserve communications or other information consistent with the existence of an attorney-client privilege;

(2) To the extent that Four Star enjoyed an attorney-client privilege in respect to any communications to or from any lawyers employed by Four Star on the one hand, including but not limited to defendant Cohn and Ms. Pompei, and any non-lawyer employee or other agent of Four Star Financial Services, LLC, on the other hand, Four Star waived the attorney-client privilege with respect to any and all such communications relating to or touching and concerning the operation of the telemarketing programs;

(3) To the extent that Four Star Financial Services, LLC, has not waived any remaining attorney-client privilege, then the crime-fraud exception to the attorney-client privilege is fully applicable and entirely vitiates such privilege;

(4) The absence, waiver and/or vitiation of any otherwise applicable attorney-client privilege as set forth above encompasses any independent "duty of confidentiality," and, as a matter of federal law, Pompei has no obligation under any state's law or any state's rules of professional ethics or professional responsibility, to preserve or protect, or to withhold upon inquiry by any government attorney or law enforcement agent, any knowledge or information in her possession by virtue of her employment with Four Star Financial Services, LLC, which relates to or concerns the operation of the Four Star Financial, LLC telemarketing program(s) in and after November 1999, and Stacey Pompei, Esq., may not be subject to civil liability or criminal prosecution, nor may she be subjected to any professional disciplinary proceedings, based on any truthful testimony given in this case or any disclosure of such knowledge or information to any government lawyer or agent in the course of pre-trial preparation for her appearance as a witness in this case.

Furthermore, I directed Pompei to cooperate with government counsel and the law enforcement agents assisting them in preparing her proposed testimony. In the end, the government did not call Pompei to testify.

This opinion elaborates on my reasons for the above order.

## II.

Four Star cannot assert its attorney-client privilege with regard to communications between Pompei and others relating to the telemarketing program because: (1) Four Star waived its right to assert the attorney-client privilege; (2) the crime-fraud exception to the attorney-client privilege applies in the circumstances of this case; and, alternatively, (3) the attorney-client privilege never existed at Four Star in respect to its operation of the telemarketing program covered by the indictment. Furthermore, Four Star's waiver of the privilege and/or the vitiation of privilege

by operation of law, likewise vitiates any "duty of confidentiality" imposed by California law upon Four Star's in-house counsel.

### A.

The attorney-client privilege protects confidential communications between lawyer and client from disclosure. *In re Grand Jury Subpoena*, 341 F.3d 331, 334–35 (4th Cir.2003); *Hawkins v. Stables*, 148 F.3d 379, 384 (4th Cir.1998). It applies to individuals and corporations and to in-house and outside counsel. *Upjohn Co. v. United States*, 449 U.S. 383, 394, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981) (attorney-client privilege applies to communications between corporate counsel and employees); *X Corp. v. John Doe*, 805 F.Supp. 1298, 1309 (E.D.Va.1992) (citing cases) (attorney-client privilege applies to in-house counsel). The Fourth Circuit has adopted the "classic test" of the attorney-client privilege:

> The privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

*United States v. Jones*, 696 F.2d 1069, 1072 (4th Cir.1982)(per curiam)(quotation marks omitted)(*quoting United States v. Shoe Machinery Corp.*, 89 F.Supp. 357, 358–59 (D.Mass.1950)).

The party asserting an attorney-client privilege must prove its applicability as well as its non-waiver. *Id.* at 1072; *In re Grand Jury Subpoena*, 341 F.3d at 335. The holder of the privilege can waive it "expressly, or through conduct." *Hawkins*, 148 F.3d at 384. To the extent that Four Star may have met its burden of proving the existence of the attorney-client privilege, it clearly waived the privilege in each of two ways: first, Four Star waived its attorney-client privilege when it voluntarily disclosed communications regarding the telemarketing program by responding to the grand jury subpoenas served upon it, and second, when Cohn, Four Star's General Counsel, raised an "advice of counsel" defense in his opening statement at trial.

### 1.

Four Star waived its attorney-client privilege as to the telemarketing program when it disclosed numerous e-mails, including e-mails to and from Pompei and other Four Star attorneys, i.e., Cohn and Ozimek. Confidentiality is "often characterized as 'the essence' of [attorney-client] privilege." *In Re Grand Jury Proceedings*, 727 F.2d 1352, 1355 (4th Cir.1984)(quoting *United States v. Weger*, 709 F.2d 1151, 1154 (7th Cir.1983)). "Any disclosure inconsistent with maintaining the confidential nature of the attorney-client relationship waives attorney-client privilege." *Jones*, 696 F.2d at 1072. When Four Star disclosed communications concerning the telemarketing program to the government, the communications were no longer confidential and the attorney-client privilege was waived.

The Fourth Circuit rejects the concept of limited waiver of attorney-client privilege. *In re Martin Marietta Corp.*,

856 F.2d 619, 623 (4th Cir.1988). When a party selectively discloses certain documents, it may waive protection of other documents that relate to the same issue. *Hawkins,* 148 F.3d at 384; *In re Martin Marietta,* 856 F.2d at 623–24; *McCafferty's Inc. v. The Bank of Glen Burnie,* NO. CIV. A. MJG–96–3656, 1998 U.S. Dist. LEXIS 12859 at *19 (D.Md. Jan. 26, 1998). "Any voluntary disclosure by the client to a third party waives the privilege not only as to the specific communication disclosed, but often as to all other communications relating to the same subject matter." *Jones,* 696 F.2d at 1072 (*citing In re Sealed Case,* 676 F.2d 793, 808–09 (D.C.Cir.1982)).

In *Hawkins,* the plaintiff claimed that the defendant, his ex-spouse, had wiretapped their phone during their marriage. 148 F.3d at 384. During her deposition the defendant answered questions regarding communications with her attorney and denied that they had discussed the alleged wire tap. *Id.* The court found that by responding to questions, even if only to deny the existence of a communication with her attorney, the defendant waived attorney-client privilege as to the subject of the wire tap. *Id.* The defendant, therefore, was barred from asserting the attorney-client privilege to prevent her attorney's testimony regarding the wiretap. *Id.* Similarly, when Four Star voluntarily produced communications from Pompei regarding the telemarketing program in response to the grand jury subpoenas, it waived its attorney-client privilege.

 Four Star claims that it did not waive its attorney-client privilege because it produced a privilege log in which it asserted privilege over various communications relating to the telemarketing program, and because the disclosed e-mails were only "operational communications." I disagree. First, the e-mails are clearly not mere "operational communications." They address substantive issues relating to the telemarketing program and contain both business and legal advice. There is no merit in Four Star's contention that they are "operational communications." Second, Four Star's argument that selective disclosure of the e-mails did not result in waiver fails as a matter of law. Despite its privilege log, when Four Star produced e-mails regarding the telemarketing program it waived the attorney-client privilege "as to all information related to the same subject matter." *Martin Marietta,* 856 F.2d at 623. As one court has noted:

A waiver of the privilege as to all communications ordinarily follows from the voluntary waiver even if made *with limitations* of one or more similar communications. Thus, if a client, through his attorney, voluntarily waives certain communications, but guarded with a specific written or oral assertion at the time of the waiver that it is not its intention to waive the privilege as to the remainder of all similar communications, the privilege, as to the remaining undisclosed communications, is nevertheless waived.

*Duplan Corp. v. Deering Milliken, Inc.,* 397 F.Supp. 1146, 1162 (D.S.C.1974). A privilege log is not properly used as a tool to bypass the prohibition of selective disclosure. *Duplan,* 397 F.Supp. at 1162; *F.C. Cycles International, Inc. v. Fila Sport,* 184 F.R.D. 64, 79 (D.Md.1998). When Four Star voluntarily produced communications concerning the telemarketing program, it waived the attorney-client privilege as to all communications relating to that program.

 Four Star also argues that it did not waive its attorney-client privilege through disclosure because it inadvertently produced one e-mail dated February 5, 2001, when, on the eve of trial, I ordered an expedited production of documents

which admittedly had not been produced in response to grand jury subpoenas. This argument is unavailing. Waiver did not take place simply because the February 5, 2001, e-mail was produced, inadvertently or not. Rather, Four Star waived its attorney-client privilege through disclosure because it had earlier disclosed multiple communications relating to the telemarketing program.

## 2.

■ In the unique circumstances of this case, I also agree with the government's contention that *Four Star waived its attorney-client privilege when its General Counsel, Cohn, raised "advice of counsel" as a defense in his opening statement to the jury.* When a party "raises an issue which can only be effectively rebutted by inquiry into an attorney-client communication," the "advice of counsel" is placed at issue and attorney-client privilege is typically deemed waived. *McCafferty's*, CIV. A. NO. MJG–96–3656, 1998 U.S. Lexis 12859 at *8 (*citing generally* Scott N. Stone & Robert Taylor, Testimonial Privileges Sect. 1.50 (2d ed.1996)); *United States v. Workman*, 138 F.3d 1261, 1263 (8th Cir.1998) (holding that defendant could not "selectively assert privilege to block the introduction of information harmful to his case after introducing other aspects of his conversations with [his attorney] for his own benefit)." (*citing United States v. Bilzerian*, 926 F.2d 1285, 1292 (2nd Cir.1991)).

■ In his opening statement, Cohn's counsel stated that Four Star's lawyers, Ozimek and Pompei, "were assigned to exercise legal oversight of this program, and they did. *You will see evidence and hear testimony that they were his eyes and ears and at his assignment to review the legal aspects of [the telemarketing] program. And that was something that was important to Mr. Cohn.*" May 6, 2003, Trans. at 45 (emphasis added). By asserting that he, as General Counsel of Four Star, relied on Four Star's in-house counsels' advice as to the legality of the telemarketing program he headed, Cohn, and through him Four Star, unambiguously raised "advice of counsel" as a defense and thereby waived Four Star's attorney-client privilege.*

---

* A recurring theme in my colloquies with counsel throughout trial revolved around the transparent attempt by Cohn and Four Star to trade on the other's privilege, i.e., Cohn's testimonial privilege, in the benefits of which Four Star did not share, and Four Star's attorney-client privilege, in the benefits of which Cohn did not share. Although nominally represented by independent counsel, it could not be more obvious that, under the circumstances here, Cohn, as General Counsel of Four Star, was the alter ego of Four Star, at least in respect to the issue of invocation and waiver of the latter's attorney-client privilege. (Remarkably, Cohn did not take a leave of absence or otherwise relinquish his duties as General Counsel of Four Star throughout these proceedings.) As the quotation from Cohn's opening statement set forth in the text reveals, Cohn essentially promised to call Pompei and/or Ozimek as witnesses to testify on behalf of the defense. In the end, the defendants called no witnesses at trial (as was their prerogative), but the government was not bound to wait until the defense case to confront head-on the "advice of counsel" defense which had been so clearly projected in the opening statements. Manifestly, therefore, when Cohn raised "advice of counsel" as a defense, he thereby waived Four Star's attorney-client privilege. Cohn cannot assert that he relied on Four Star's in-house counsel in order to limit his potential criminal culpability, while Four Star asserts an attorney-client privilege in an effort to bar the government's proper attempt to obtain documents and to present testimony. As the government notes, permitting Four Star to assert an attorney-client privilege, while permitting Cohn to take refuge in an "advice of counsel" defense based on advice to him from Four Star's in-house counsel, allows the defense "to have their cake and eat it, too," so much cake (in

### B.

■ In any event, Four Star cannot invoke the attorney-client privilege in this case because any attorney-client privilege that existed at Four Star was vitiated by the crime-fraud exception. "The crime-fraud exception to the attorney-client privilege provides that a client's communications with an attorney will not be privileged if made for the purpose of committing or furthering a crime or fraud." *In re Grand Jury Subpoena,* 884 F.2d 124, 127 (4th Cir.1989) (*citing Clark v. United States,* 289 U.S. 1, 15, 53 S.Ct. 465, 77 L.Ed. 993 (1933); *In re Grand Jury Proceedings,* 727 F.2d at 1355). Four Star forfeited its right to assert the attorney-client privilege when Pompei (and perhaps Ozimek) was consulted, "not with respect to past wrongdoings but rather to further a continuing or contemplated criminal or fraudulent scheme." *In re Grand Jury Subpoenas,* 734 F.Supp. 1207 (E.D.Va.1990), *aff'd in part and vacated in part,* 902 F.2d 244 (4th Cir.1990) (*quoting In re Grand Jury Subpoenas Duces Tecum,* 773 F.2d 204, 206 (8th Cir.1985)) (citations omitted).

■ The burden is on the government to show that the disputed communications were made in furtherance of a crime or fraud. *X Corp. v. John Doe,* 805 F.Supp. 1298, 1309 (E.D.Va.1992). *In re Grand Jury Subpoena,* 884 F.2d at 127 (*citing In re Grand Jury Proceedings,* 674 F.2d 309, 310 (4th Cir.1982)). The alleged crime or fraud, however, need not to be proved beyond a reasonable doubt before the privilege is lost. *X Corp.,* 805 F.Supp. at 1307; *Clark,* 289 U.S. at 15, 53 S.Ct. 465 (*dicta*). Furthermore, counsel did not need to "be aware of the illegality involved; it is enough that the communication furthered, or was intended by the

client to further, that illegality." *United States v. Friedman,* 445 F.2d 1076, 1086 (9th Cir.1971) (*citing Clark,* 289 U.S. at 15, 53 S.Ct. 465; *United States v. Hoffa,* 349 F.2d 20, 38 (6th Cir.1965)). At the time I ruled in this case, the government made a powerful prima facie showing that Four Star "was engaged in or planning a criminal or fraudulent scheme when [it] sought the advice of counsel to further the scheme," and that the privileged communications "bear a close relationship to the ... existing or future scheme to commit a crime or fraud." *Chaudhry v. Gallerizzo,* 174 F.3d 394, 403 (4th Cir.1999) (*quoting In re Murphy,* 560 F.2d 326, 338 (8th Cir.1977)). For example, based on the record of the trial proceedings involving co-defendant Katz, over which I presided in May 2002, the records of the guilty pleas of co-defendants Connor, Augen, and Hatfield, and the government's additional proffers of Four Star's role in the scheme, it was abundantly evident that a fraudulent scheme existed at Four Star and that Pompei, in the day-to-day fulfillment of her duties at Four Star, was employed by Cohn and Four Star to perpetuate that scheme. *Cf. United States v. Zolin,* 491 U.S. 554, 572, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989). The crime-fraud exception vitiates attorney-client privilege. Of course, the jury's guilty verdict in this case as to all counts against both defendants illustrates the strength of the government's showing.

Four Star argues that if the crime-fraud exception applies here, no company that has in-house counsel and is charged with a crime will be able to assert an attorney-client privilege. This is incorrect. The crime-fraud exception does not apply because Pompei was in-house counsel, it applies because the evidence reveals that she was actively employed to advance Four

my judgment) as to rise to a subversion of the trial process.

Star's fraudulent telemarketing operations. To be sure, Pompei's contribution to the fraudulent scheme at Four Star is different from instances in which a lawyer furthered a criminal or fraudulent scheme through a specific act. *Cf. In Re Grand Jury Proceedings,* 102 F.3d 748, 751–752 (4th Cir.1996)(defendant provided counsel with fraudulent information regarding the date that a loan was issued and counsel then referenced the date in subsequent documents). Here, Pompei was not commissioned to perpetuate a discrete facet of the fraudulent scheme; rather, through her complete, though primarily unknowing, involvement in the telemarketing program, she furthered the fraudulent operation as a whole. As in-house counsel, Pompei worked under the direction and supervision of Four Star's General Counsel, Cohn, who was shown by the evidence, as the government proffered, to be in control of nearly every component of the telemarketing programs. Cohn, wearing the mantle of Executive Vice President and General Counsel, made final decisions about hiring and firing employees, he contributed to the creation of the telemarketing scripts and fulfillment packages, and he made the important decisions about the credit card programs. As subordinate attorneys, Pompei and Ozimek supported him in running the program. For example, Pompei reviewed telemarketing scripts, drafted and edited contracts, responded to legal inquiries and contributed to overall operation of the telemarketing program. These duties contributed substantially to Four Star's fraudulent telemarketing operation.

Thus, application of the crime-fraud exception here does not, as Four Star contends, signify that the exception applies whenever a company with in-house counsel is charged with a crime. Rather, the exception applies in situations such as this, where the legal services of in-house counsel are put to active, albeit unknowing, use in perpetrating a criminal scheme.

C.

▌ In the alternative, Four Star cannot assert attorney-client privilege over the testimony of in-house attorneys Pompei or Ozimek because Four Star has failed to produce sufficient evidence that the attorney-client privilege was ever established at Four Star as to the telemarketing scheme. An attorney-client privilege attaches when the attorney is acting to provide primarily legal services, assistance or opinions. *Jones,* 696 F.2d at 1072 *(citing United Shoe,* 89 F.Supp. at 358). Furthermore, communications between the lawyer and client must be maintained confidential in a manner consistent with attorney-client privilege. *Id.* In respect to the telemarketing program, counsel at Four Star did not provide primarily legal services and attorney-client communications were not maintained in a confidential manner, therefore, attorney-client privilege never existed. For the attorney-client privilege to apply, therefore, Four Star must establish that communications over which it seeks to assert privilege were made for the purpose of providing primarily legal services and that reasonable efforts were made to protect the confidential nature of that information. *See Jones,* 696 F.2d at 1072 (party asserting attorney-client privilege bears the burden of proving that it exists); *Hawkins,* 148 F.3d at 383.

▌ Communications are not privileged merely because one of the parties is an attorney or because an attorney was present when the communications were made. *Neuder v. Battelle Pacific Northwest National Laboratory,* 194 F.R.D. 289, 293 (D.D.C.2000). "When the legal advice is merely incidental to business advice, the privilege does not apply." *Great Plains*

*Mut. Ins. Co. v. Mutual Reinsurance Bureau,* 150 F.R.D. 193, 197 (D.Kan.1993); *Neuder,* 194 F.R.D. at 293. Nor does it apply to any communication "as to which a business purpose would have served as a sufficient cause, i.e., any communication that would have been made because of a business purpose even if there had been no perceived additional interest in securing legal advice." *McCaugherty v. Siffermann,* 132 F.R.D. 234, 238 (N.D.Cal.1990) (*citing Fisher v. United States,* 425 U.S. 391, 403, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1975)). Pompei was involved in numerous aspects of operations at Four Star and acted in both a business and legal capacity.

■■■ To determine whether communications were made primarily for the purpose of providing legal services, the court must consider the context in which they were made. *See Neuder,* 194 F.R.D. at 293. For example, in *Neuder,* plaintiff filed a wrongful termination action against his employer after being discharged from his employment. *Id.* at 291. The employer sought to assert attorney-client privilege over communications generated and distributed by the committee that decided to terminate plaintiff by claiming that the committee's meetings were for the purpose of rendering legal advice. *Id.* The court found, however, that although legal review was one purpose for holding the meeting, it was incidental to the primary business purpose and in-house counsel's presence did not render the communications privileged. *Id.* at 293–294. The same reasoning applies here.

Although Pompei may have provided some incidental legal services in connection with the telemarketing program, Four Star has not established that the primary purpose of her communications was legal. Four Star did not discern between business and legal services. Pompei regularly received e-mails concerning different aspects of the telemarketing program, reviewed and drafted contracts, and reviewed telemarketing scripts. When Pompei reviewed the telemarketing scripts she was providing business, not legal advice. For purposes of the present analysis, telemarketing was the core of Four Star's operations, the primary purpose of which was to sell Four Star's "product" and make a profit. Scripts promoted this goal because they provided telemarketing representatives with the information they needed to make the sales. When Pompei analyzed the scripts she provided advice so that Four Star could increase its sales and thereby its profits. Increasing profits is a business, not a legal purpose, thus, when Pompei reviewed the scripts she provided business advice. It should be noted, as well, that a legal analysis of the scripts at Four Star was largely irrelevant. The record indicates that telemarketing representatives often strayed dramatically from the provided scripts, and that Cohn and his management colleagues were well aware of this reality. Actual control over the representatives was needed to ensure that they followed the scripts and did not mislead consumers. Four Star was aware that many of the rooms were not adequately controlled. Any script review Pompei conducted was irrelevant because, unless enforced, the scripts were worthless as genuine checks on the excesses of the telemarketers. Thus, Four Star has failed to establish prima facie that Pompei's services were primarily for legal rather than business purposes. Accordingly, the attorney-client privilege did not exist as to Pompei's communications.

■■■ Additionally, Pompei's communications were customarily reviewed by both legal and non-legal personnel, thereby undermining any claim to confidentiality necessary to a claim of attorney-client

privilege. "If the document was prepared for purposes of simultaneous review by legal and nonlegal personnel, it cannot be said that the primary purpose of the document is to secure legal advice." *United States v. IBM Corp.*, 66 F.R.D. 206, 213 (S.D.N.Y.1974). The communications produced by Four Star indicate that Pompei's communications were regularly sent directly or indirectly to multiple non-management recipients, including low-ranking people from the accounting department and the various Four Star subsidiaries running the telemarketing business day-to-day. Thus, the allegedly confidential communications were not maintained confidential consistent with attorney-client privilege. Confidentiality "constitutes the essence of the attorney-client privilege." *Jones*, 696 F.2d at 1072; *See Grand Jury Proceedings*, 727 F.2d at 1356. The client must intend that communications are confidential, and they must be maintained as such in order for attorney-client privilege to apply. *Id.* Furthermore, communications must be exchanged "without the presence of strangers." *United Shoe*, 89 F.Supp. at 358–59.

For these reasons, I reiterate my alternative conclusion that the attorney-client privilege did not attach to the information and documents sought and obtained by the government in this case.

### D.

Four Star's contention that Pompei had an independent duty to maintain confidences is apparently moot, inasmuch as, in the end, the government elected not to call Pompei as a witness. There has been no showing, or even any suggestion, that Pompei made fresh disclosures not already known to the government from the earlier production of documents.

### III.

For the reasons stated on the record and for the reasons set forth herein, I am satisfied that the order entered during the trial of this case was appropriate.

