Timothy E. KOCH, et al., Plaintiffs

v.

SPECIALIZED CARE SERVICES, INC., et al., Defendants.

Civil No. MJG–04–1395.

United States District Court, D. Maryland.

Sept. 23, 2005.

Christopher B. Mead, Mark Scott London, London and Mead, Washington, DC, for Plaintiffs.

Creighton Reid Magid, Dorsey and Whitney LLP, Washington, DC, Gregory M. Weyandt, Marianne D. Short, Michelle S. Grant, Dorsey and Whitney LLP, Minneapolis, MN, for Defendants.

### Memorandum Opinion

GAUVEY, United States Magistrate Judge.

Presently pending before the Court are plaintiffs' motion to compel production of documents and responses to interrogatories, (Paper No. 39), defendants' motion for a protective order (Paper No. 40), and plaintiffs' motion to compel responses to their Fed.R.Civ.P. 30(b)(6) deposition notice.[1] (Paper No. 46.) The motions are fully briefed. A hearing was held on June 2, 2005.

---

1. Because plaintiffs' motions to compel were submitted to the Court as complete sets of briefing, citations to Paper Nos. 39 and 46 will also include a reference to the motion ("Mot."), the opposition ("Opp."), and the reply ("Rep.").

For the reasons set forth below, the Court GRANTS IN PART the motion to compel production of withheld documents, ordering the production of certain (but not all) documents for which defendants had asserted privilege, GRANTS the motion for a protective order and finally, GRANTS plaintiffs' motion to compel responses to their deposition notice because the information they seek is proper.

## I. Background

Plaintiffs are Timothy E. Koch, Mary Charbonnet Koch (his wife), Suzanne Koch (his sister), Timothy K. Koch (his son), and Mary, Leslie, and Allison Koch (his daughters). Koch and his family were the sole shareholders in a family business, Specialized Risk International, Inc. ("SRI"). SRI sold insurance for organ and bone marrow transplants to health insurers and health maintenance organizations.

The defendants are Specialized Care Services ("SCS"), United Resource Networks, Inc. ("URN"), and the CEO of URN, Dr. Richard Migliori and the President of URN, Mr. Robert Webb. SCS is an affiliate of URN, a subsidiary of United Health Group, Inc. ("UHG").

Defendant SCS bought SRI in 2003 and paid Koch and his family for ninety percent of SRI's stock. Under the Secondary Purchase Agreement between Koch and SCS, SCS retained the option of acquiring the remaining ten percent of SRI stock subject to certain conditions. As part of SCS's purchase of SRI, Koch entered into an employment agreement with UHG at the same time, agreeing to remain with SCS for an additional three years unless terminated early.

The relevant provision of the Secondary Purchase Agreement provides that the purchase price of the retained SRI shares would depend on the circumstances of Koch's separation from the company. Specifically, the Agreement set forth that if Koch was terminated for cause or voluntarily resigned, then he would be paid $1.00 for all the retained shares. If he was terminated without cause, then he would receive the full value for the stock, $6,250,000 at a minimum.

Two claims remain before the Court:[2] that SCS breached the Secondary Purchase Agreement in failing to pay Koch at least $6.25 million for the remaining SRI stock, the amount due under the contract if UHG terminated Koch without cause (Count I); and that Dr. Richard Migliori and Robert Webb of URN tortiously interfered with Koch's employment agreement and the Secondary Purchase Agreement, resulting in plaintiffs' "los[ing] the opportunity to earn the full $12,500,000 purchase price for their remaining SRI stock" (the maximum amount Koch could receive at the end of the agreement if he remained employed) (Count III). (Paper No. 1, 16–17).

It is undisputed that after Koch began work at SCS, management conflicts arose among Koch, Webb, and Migliori. A meeting was held on March 5, 2004, for the discussion of a business opportunity, but was dominated by differences of opinion as to operations. Present at the meeting were Koch, Mary Charbonnet Koch, Sue

---

**2.** In a March 10, 2005 Order, Judge Garbis dismissed Count II as moot without prejudice because plaintiffs would be able to assert all contentions set forth in Count II in connection with their claim in Count I. (Paper No. 53). Count IV was also dismissed without prejudice as moot due to the "existence of a parallel covenant." (*Id.*) On April 1, 2005, Judge Garbis granted summary judgment as to Count III with regard to defendant URN. (Paper No. 58 at 24). The Court ordered the case to proceed on Count I against SCS and on Count III as to the individual defendants, Dr. Migliori, CEO of URN and Mr. Webb, President of URN. (*Id.*)

Koch, Migliori, Webb, David Wichmann, the CEO of SCS, Ted Lyle, the actuary of SCS, and Mike Mikan, the CFO of SCS. All agree that Wichmann asked if everyone could continue to work together. However, there is disagreement between the parties as to what was said and what transpired thereafter. This disagreement as to facts does not, however, prevent resolution of this discovery dispute.

In his Memorandum and Order dated April 1, 2005, Judge Garbis set out the parties' competing views as to the succeeding events, which culminated in Koch's receipt of a letter on March 10, 2004, from Tom Ryan, SCS's in-house counsel purporting to formally accept Koch's resignation effective March 5, 2004, and exercising SCS's rights under the Secondary Purchase Agreement to purchase Koch's remaining shares for $1.00. On March 11, 2004, Koch responded to Ryan's letter denying that he resigned and subsequently brought this litigation.

The present discovery dispute largely involves plaintiffs' entitlement to communications that circulated between the defendants and counsel before and after the

meeting with Koch on March 5, 2004, and communications related to the resignation letter sent on March 10, 2004. Defendants have listed these communications on a revised privilege log claiming attorney-client privilege and work product doctrine.[3] Plaintiffs seek to discover these documents, arguing that privilege either does not apply as the communications were intended to be made public or has been lost by allegedly tortious or fraudulent conduct of the defendants.[4]

## II. Discussion

### A. Plaintiffs' Motion to Compel Production of Allegedly Privileged Documents

Plaintiffs have moved to compel a full response to its Interrogatory No. 17 and the production of accompanying documents under Request No. 18 listed on defendants' November 4, 2004 revised and December 10, 2004 supplemental privilege logs.[5] (Paper No. 39 at 18.) In resisting discovery of the communications related to the alleged resignation of Koch, the defendants have claimed that the attorney-client privilege and work-product doctrine apply.[6]

---

3. Defendants identify the discovery requests in dispute as plaintiffs' Interrogatories No. 17 and 18. (Paper No. 39 Opp. at 7–8.) Although defendants do not specifically identify the documents scheduled on the privilege log as responsive to plaintiffs' interrogatories, the Court understood that the scheduled documents relate only to those requests.

4. Also, one of the documents listed on defendants' privilege log—# 5 was inadvertently submitted with exhibits in a separate court filing. Defendants seek a protective order and ask for the destruction or return of the confidential memorandum and that plaintiffs make no use of its contents. The Court shall evaluate the discoverability of that document, both under the crime-fraud exception and the case law on inadvertent disclosure.

5. Interrogatory No. 17: Identify all persons who communicated with Timothy F. Ryan

regarding the alleged resignation of Mr. Koch and the subject matter of these communications.

Response: SCS object to Interrogatory No. 17 on the grounds that it seeks information subject to the attorney-client privilege and work product doctrine.

Request No. 18: All documents related to, or reflecting communications between you, your employees, and your counsel, whether in-house counsel or retained, related to the subject matter of whether Tim Koch had resigned or not resigned his employment with you.

Response: Defendants object to Request No. 18 on the grounds that it seeks documents subject to the attorney-client privilege and work product doctrine.

6. Defendants assert an initial challenge to the timeliness of plaintiffs' motion to compel.

Plaintiffs, in their motion to compel, seek to discover these communications, arguing that they are not privileged because the information sought was provided to in-house counsel with the knowledge and expectation that it would be communicated to Koch and his attorney. Alternatively, the plaintiffs argue that if the information is privileged, then the crime-fraud exception to the attorney-client privilege applies and they are entitled to the information. The Court rejects plaintiffs' first argument, but agrees that some of the documents at issue satisfy the crime-fraud exception and therefore are not privileged.

1. The Attorney–Client Privilege and Disclosure to a Third Party

■ The attorney-client privilege is recognized as "the oldest of the privileges for confidential communications known to the common law." *Upjohn v. United States*, 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981). Nevertheless, because the application of the privilege interferes with the truth-seeking function of the judicial system by withholding relevant information from the fact finder, the privilege contains limitations and should be narrowly construed. *E.I. du Pont de Nemours & Co. v. Forma–Pack, Inc.*, 351 Md. 396, 415, 718 A.2d 1129, 1138 (1998). Because this is a diversity action involving exclusively state law claims, Maryland privilege law applies. *See* Fed.R.Evid. 501.

Local Rule 104.8(a) requires that a motion to compel should be brought within thirty (30) days of the party's receipt of the response. Plaintiffs filed their motion on November 19, 2004, which was a short time after defendants URN, Webb, and Migliori filed their responses to Interrogatory No. 17. Defendant SCS served its response on August 16, 2004. Thus, the motion to compel would be timely only as to URN, Webb, and Migliori. In the interests of justice, the Court will treat the motion to compel as timely as to SCS, too.

■ Only those communications pertaining to legal assistance and made with the intention of confidentiality fall within the protection of privilege. *Forma–Pack* at 415–16, 718 A.2d at 1138 (quoting *Burlington Indus. v. Exxon Corp.*, 65 F.R.D. 26, 37 (D.Md.1974)). With respect to the first element, a communication "must relate to professional advice and to the subject-matter about which such advice is sought" in order to qualify for privilege. *Forma–Pack*, 351 Md. at 416, 718 A.2d at 1138–39 (quoting *Lanasa v. State*, 109 Md. 602, 617, 71 A. 1058, 1064 (1909)). In the current situation, the defendants undisputedly sought the legal advice of their in-house counsel. Defendants state that counsel reviewed Koch's employment agreement and the Secondary Purchase Agreement after the meeting and prior to the sending of the resignation letter to Koch. (Paper No. 39 Opp. at 7).

As to the second element for privileged communications, the Court must determine whether the communications were expected to be confidential. "It is essential that it not be intended for disclosure to third persons." *Id.* at 416, 718 A.2d 1129, 718 A.2d at 1139 (citing *United States v. (Under Seal)*, 748 F.2d 871, 874 (4th Cir. 1984)) Even though *Under Seal* applied the federal common law of privilege, the Maryland Court of Appeals favorably cited it and applied its rule of law in *Forma–Pack*. Thus, the Court will apply the reasoning of *Under Seal* as adopted by the Maryland courts.

Defendants also argue the motion to compel production of documents for request no. 18 as to all defendants is not timely. Discovery Guideline 9 of the Local Rules states that a party seeking disclosure of documents or information objected to as privileged should file the motion to compel twenty (20) days after receipt of a privilege log. Because there is a dispute as to whether the privilege log was complete when submitted on October 22, 2004, the Court will treat the motion as timely.

In *Under Seal,* the court held that the attorney-client privilege did not apply to a whole series of corporate documents "because the communications revealed could not reasonably have been expected to remain confidential." 748 F.2d at 877. In examining the documents at issue, the court stated that several of the documents contained information that "would reasonably be expected to be imparted to a third party." *Id.* at 877–78. The court declared, "if a client communicates information to his attorney with the understanding that the information will be revealed to others, that information . . . will not enjoy the privilege." *Id.* at 875. Furthermore, in determining the intent of the client as to confidentiality, the court "must look to the services which the attorney has been employed to provide and determine if those services would reasonably be expected to entail the publication of the clients' communications." *Id.* (quoted in *Forma–Pack,* 351 Md. at 417, 718 A.2d at 1139). "Only when the attorney has been authorized to perform services that demonstrate the client's intent to have his communications published will the client lose the right to assert the privilege as to the subject matter of those communications." *Id.* at 875–76.

■ Plaintiffs suggest the communications are not privileged because they were intended to be communicated to Koch and his attorney. (Paper No. 39 Mot. at 18–19). The Court disagrees. Defendants' correspondence with their in-house counsel was intended to be confidential. In considering the role of the attorney at the time the communications were made, the Court finds that defendants ostensibly did not contact their counsel for the sole purpose of responding to Tim Koch. Tim Ryan, SCS's general counsel, did draft letters on March 10 and 12, 2004, and other communications sent to Koch's former counsel. The privilege log contains numerous entries about communications between in-house attorneys and defendants during the same time period. However, the simple fact that attorney-client communications eventually result in a "public" communication does not rob the preliminary or prior attorney-client communications of their privileged status.

■ Defendants did respond to Koch, but privilege is lost only where a client authorizes attorney services based on the client's intent to publish its communications. *Id.* at 875–76. Here defendants used their counsel for consideration and advice about Koch's employment situation and analysis of Koch's communications to defendants and formulation of their legal position; defendants did not employ counsel to publish its communications. *See id.* at 875 [7] (distinguishing situation where at-

7. The court focused on the role of the attorney to determine whether confidentiality was intended, stating, "Rather than look to the existence of the attorney-client relationship or to the existence or absence of a specific request for confidentiality, a court must look to the services which the attorney has been employed to provide, and determine if those services would reasonably be expected to entail the publication of the clients' communications." *Id.* at 875. The court distinguished the case from *In re Grand Jury,* where the client had decided to publish a prospectus *before* approaching their attorneys, thus indicating that the attorney had been retained to convey information to third parties, not to provide legal advice for the client's guidance. *Id.* In *(Under Seal),* the client had retained an attorney to investigate the possibility of filing papers which, if filed, would be disclosed to third parties. The court held that only when the client authorizes the attorney to perform services that demonstrate the client's intent to have his communications published will the client lose the right to assert the privilege as to the subject matter of those communications. *Id.* at 876.

torney had been retained to convey information to third parties from situation where attorney provided legal advice for client's guidance); *In re Grand Jury Proceedings v. Under Seal,* 33 F.3d 342 (4th Cir.1994) (requiring clients to demonstrate "that they did not retain the services of the attorneys for the purpose of advice on publication" to prevail on the claim of privilege); *In re Grand Jury Proceedings,* 727 F.2d 1352, 1354–56 (4th Cir.1984) [8] (holding that attorney-client privilege does not apply to information communicated by a client to the attorney with the understanding or intention that the communication was to be made known to others).

In the most recent expression of the Fourth Circuit view on privilege and public disclosure, *In re: Grand Jury Subpoena,* 341 F.3d 331 (4th Cir.2003) [9], the court reiterated the client's intent to publish as touchstone for determining whether confidentiality was expected and whether attorney-client privilege would attach. Moreover, in rejecting the government's demand for all documents, the Fourth Circuit noted that the government's suggested approach "would lead to the untenable result that any attorney-client communications relating to the preparation of publicly filed legal documents—such as court pleadings—would

be unprotected." *Id.* at 334. Accordingly, the Court does not believe that Fourth Circuit precedent strips consultative attorney-client communications of privilege simply because as a result, a "public" letter of legal position is subsequently sent. Such a sweeping interpretation would interfere with the noble purposes of the attorney-client privilege to "encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States,* 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981). Thus, the Court finds that the communications between the defendants and their counsel about Koch's employment and the purchase of remaining stock are privileged so far as there was no intention to publish their contents.

### 2. The Crime–Fraud Exception

Even though these communications are privileged, the plaintiffs maintain their right to discovery based on the crime-fraud exception to attorney-client privilege. Defendants argue that the crime-fraud exception does not apply to the tort of malicious interference alleged here, that

---

**8.** In *In re Grand Jury,* the government subpoenaed an attorney to testify before a grand jury regarding conversations with his client made in connection with the preparation of a prospectus for a proposed private placement of limited partnership interests. The court held that the information given to the attorney was to assist in preparing the prospectus for viewing by other private investors, and was not intended to be kept confidential. Thus, attorney-client privilege did not apply.

**9.** In this case, the client had filed a "green card" application with the Immigration and Naturalization Service indicating that he had not been previously arrested, cited, charged, or imprisoned for breaking or violating any law or ordinance. An FBI background check

revealed a previous shoplifting conviction. When the FBI questioned the client about his negative response to the question about past crimes, the client indicated he answered under the advice of an attorney. A grand jury subpoenaed the client's counsel, who would not answer whether he advised his client to answer "no" in response to the question about past crimes. The district court granted the government's motion to compel on the basis of implicit waiver, but concluded that the attorney-client privileged would have protected the advice given by counsel to his client if not waived. *Id.* at 334. The Fourth Circuit agreed with the lower court and rejected the government's argument that the client's disclosure on the "green card" form makes privilege inapplicable.

plaintiffs cannot make out the necessary prima facie case,[10] and that plaintiffs' allegations of a "fraud upon the court" are baseless.

The principal question at issue here is what type of alleged conduct fall within the ambit of the crime-fraud exception. The Court first will examine the nature of the alleged conduct by the defendants. The Court will then, in light of defense arguments, review the state of the law on the scope of the crime-fraud exception, to determine whether the conduct alleged here is within the "crime-fraud exception," thereby depriving otherwise privileged documents of their protection.

### a. The Conduct Alleged Here

Plaintiff Koch stated a count for tortious interference in the complaint, alleging that Migliori, Webb, and URN "procured the breach of the Secondary Purchase Agreement and Employment Agreement without justification" and "acted with actual malice toward Tim Koch . . . with the intent of depriving [him] of the economic benefits of the [agreements.]" (Paper No. 1 at 17.) Defendants filed a motion for summary judgment, arguing, *inter alia*, that plaintiff's tortious interference claim failed, as a matter of law, as plaintiff could not establish the requisite degree of wrongful conduct. In his thorough analysis of the facts and the law, Judge Garbis concluded that the plaintiff had satisfied this element of the tort. " . . . [P]laintiff has produced some evidence. Plaintiff also has produced evidence that Migliori told Wichmann and Webb told Ryan that Koch had resigned or quit to support their contention that Migliori and Webb did not believe

that Koch had required or quit. Moreover, no evidence has been produced that Migliori tried to disavow Wichmann of his conclusion that Koch had quit. The Court finds that Migliori's and Webb's actions raise a factual issue as to whether wrongful means of 'injurious falsehood and fraud' were used to affect Koch's departure from SCS." [11] (*Id.*)

In their briefing on the instant discovery motion, plaintiffs further elaborated on the wrongful conduct of defendants, arguing that the defendants "conspired to drive Mr. Koch from the company by falsely claiming that he had resigned." (Paper No. 39 Mot. at 22.) The purpose of this scheme, according to plaintiffs, was to rid the company of Koch while also depriving him of at least $6 million, the full-value purchase of Koch's remaining stock. (*Id.*) Moreover, the defendants allegedly enlisted in-house counsel in the scheme, whereby a letter confirming Koch's resignation was sent to Koch, even though he claims to not have officially resigned. (*Id.*) Throughout their briefing, plaintiffs refer to this conduct as a "serious fraud on [the] Court" that was "concocted with the assistance of their attorneys." (*Id.* at 23). In essence, the wrongful conduct alleged is that Webb and Migliori, knowing Koch did not resign, advised Wichmann and others otherwise and employed advice of counsel to portray his departure as a resignation and engaged in communications in furtherance of this wrongful conduct. The Court must determine whether this alleged conduct falls within the crime-fraud exception under Maryland law.

---

**10.** At a hearing held on June 2, 2005, the Court found that plaintiffs had met the initial threshold to support in *camera* review of the documents (discussed below) and ordered defendants' to produce the withheld documents to the Court.

**11.** Wichmann testified at deposition: "First and foremost is that it was a resignation. That was the first communication I had, okay, with Dr. Migliori." *Id.* at Ex. C, at 152. In his deposition, Webb testified that he told Ryan that in his opinion Koch had resigned. *Id.* at Ex. D, at 105.

b. Scope of the Crime–Fraud Exception

In *U.S. v. Zolin*, the Supreme Court held that: "[i]t is the purpose of the crime-fraud exception to the attorney-client privilege to assure that the seal of secrecy between a lawyer and client does not extend to communications made for the purpose of getting advice for the commission of a fraud or crime." 491 U.S. 554, 563, 109 S.Ct. 2619, 105 L.Ed.2d 469 (internal quotations and citations omitted (1989)).[12] "The attorney-client privilege must necessarily protect the confidences of wrongdoers, but the reason for that protection— the centrality of open client and attorney communication to the proper functioning of our adversary system of justice—'ceas[es] to operate at a certain point, namely, where the desired advice refers ... to *future wrongdoing.*'" *Id.* at 562–63, 109 S.Ct. 2619 (quoting 8 Wigmore, § 2298, p. 573) (emphasis in original).

The defendants are correct that the scope of the crime-fraud exception here is a matter of state law. Maryland courts have adopted the crime fraud exception to the attorney-client privilege for communi-

cations in furtherance of commission of a crime or a fraud. However, the Maryland Court of Appeals has not ruled on the applicability of the exception to torts.

In *Newman v. State*, 384 Md. 285, 309, 863 A.2d 321, 335 (2004), the Court of Appeals for the first time explicitly acknowledged that the crime-fraud exception applied in Maryland to "exempt communications seeking advice or aid in furtherance of a crime or fraud, from the protection of the attorney-client privilege." [13] In reaching this holding, the court cited approvingly to the Restatement (Third) of the Law Governing Lawyers, which defines the crime-fraud exception as follows:

The attorney-client privilege does not apply to a communication occurring when a client:

(a) consults a lawyer for the purpose, later accomplished, of obtaining assistance to engage in a crime or fraud or aiding a third person to do so, or

(b) regardless of a client's purpose at the time of consultation, uses the lawyer's advice or other services to engage in or assist a crime or fraud.

---

**12.** Although in this opinion, the Court discusses the crime-fraud exception to the attorney-client privilege, the standards generally are no different in the context of the work-product doctrine. Epstein, The Attorney–Client Privilege and the Work Product Doctrine 454 at 591 (4th ed. 2001) ("Courts generally hold that the exception applies to the work-product doctrine as much as it does to the attorney-client privilege. When a document has been prepared in anticipation of litigation to further a fraud, the work-product protection will generally not be available."). Unlike in the attorney-client privilege context, however, both the client's and the attorney's intentions and knowledge at the time of the disputed documents' creation are relevant when opinion work product is at issue. *In re Grand Jury Proceedings*, 33 F.3d 342, 349 (4th Cir.1994) (crime-fraud exception does not apply to opinion work product unless both the client and the attorney was aware of the

fraudulent conduct). Additionally, both the client and the attorney have an interest in work-product materials and have standing to assert the protection. In *re Doe*, 662 F.2d 1073, 1079 (4th Cir.1981), *cert. denied*, 455 U.S. 1000, 102 S.Ct. 1632, 71 L.Ed.2d 867 (1982). Thus, an innocent client may continue to assert the work-product protection even where the material was prepared by a fraudulent attorney (and vice versa). Epstein, *supra* at 594.

**13.** In *Newman*, the alleged wrongdoing was conspiracy to commit first-degree murder and attempted first-degree murder. The Court declined to find the exception applicable, finding that "[t]here is nothing in the record indicating Newman sought advice as assistance in furtherance of a crime when she stated her intention to kill her husband and children." *Id.* at 336.

Restatement (Third) of Law Governing Lawyers § 82 (2000).

▮ The commentary defines fraud "for the purpose of the exception as requir[ing] a knowing or reckless misrepresentation . . . likely to injure another." § 82 comt. d. Moreover, in Maryland, "[f]raud encompasses, among other things, theories of fraudulent misrepresentation, fraudulent concealment, and fraudulent inducement." *Sass v. Andrew*, 152 Md.App. 406, 432, 832 A.2d 247, 261 (2003). *Cf. Greco v. State*, 65 Md.App. 56, 66, 499 A.2d 209, 214 (1985) ("Courts have been reluctant to define fraud with any degree of preciseness. Nevertheless, it is safe to say that fraud includes the knowing and willful making of a false statement or false representation of a material fact with the intent and for the purpose of having another rely upon that false statement or false representation to his or her detriment.") (citing *Suburban Properties Management, Inc. v. Johnson*, 236 Md. 455, 460, 204 A.2d 326, 329 (1964)); *Appel v. Hupfield*, 198 Md. 374, 84 A.2d 94 (1951).

▮ Although Count III is not pled as a "fraud," but as an intentional tort involving misrepresentation, deception, and deceit, the conduct alleged would appear to constitute fraud under the definitions in the Restatement and in Maryland law. Indeed, Judge Garbis ruled as much in finding that defendants may have engaged in "injurious falsehood or fraud" (albeit in the context of satisfying the elements of a tort). The fact that plaintiff has pled a tort, not a fraud, does not change the nature of the objected-to conduct. As discussed below, courts increasingly focus on the conduct alleged. The determinant of the exception's applicability is the wrong-fulness of the conduct before the Court, not the form of its pleading. Accordingly, the Court finds that the alleged wrongful conduct here satisfies the definition of fraud to bring it within the Maryland crime-fraud exception.

▮ Assuming, however, for purposes of argument, that plaintiff's characterization of the subject wrongdoing as a tort rather than a fraud brings it outside of the traditional "crime-fraud exception," that does not mean that the exception is not nonetheless applicable. Courts focus on the nature of allegedly wrongful conduct. It is not necessary to a finding of the exception that a party plead a specific crime or cause of action in fraud. As discussed below, courts have moved to expand the conduct undeserving of the attorney-client privilege.

However, the Court readily acknowledges that there is no Maryland Court of Appeals opinion explicitly applying the crime-fraud exception beyond crimes and fraud claims. In *Newman*, the alleged wrongdoing was conspiracy to commit first-degree murder and attempted first-degree murder.[14] However, language of the Court's opinion and its citation to the Restatement demonstrates its unequivocal acceptance of the exception's application to "fraud" as well as "crime." Defendants, however, cite to an earlier decision of the Maryland Court of Special Appeals to demonstrate Maryland's rejection of the crime-fraud exception to torts.

In *Fraidin v. Weitzman*, 93 Md.App. 168, 611 A.2d 1046 (1992), the Court of Special Appeals of Maryland did reject the applicability of the exception to a tortious interference of contract claim. In the

---

14. In *Sears, Roebuck, & Co. v. Gussin*, 350 Md. 552, 714 A.2d 188 (1998), the Court of Appeals considered the application of a "fraud" exception to the accountant-client privilege. The court declined to decide whether the exception existed because the facts of the case would not have supported the application of the exception. *Id.* at 568–69, 714 A.2d at 196.

case, attorneys, who had been discharged by their clients prior to settlement of a civil action, brought a tortious interference of claim against their clients' opponent attorneys. The relevant issue on appeal concerned whether notes and testimony about communications between the opponent's attorney and the opponent were properly withheld on the basis of the attorney-client privilege. *Id.* at 187, 611 A.2d at 1056. The court held that the attorney-client privilege was intact because no waiver had occurred and because the crime-fraud exception was inapplicable. *Id.* at 231, 611 A.2d at 1077. The parties arguing for the exception had alleged that opposing counsel had aided his client in committing a "malicious tort." Indeed, the court found actual malice in the opponent's interference to justify imposition of punitive damages. In refusing to apply the exception, the court stated, with no discussion and no citation to authority, that the crime-fraud exception "requires that advice be obtained for the purpose of perpetrating a fraud, not some other tort." *Id.* at 231, 611 A.2d at 1077.[15]

■ While the *Fraidin* decision is instructive on the issue before this Court, as a decision of an intermediate appellate court, it is not binding on the federal court here. Although the decision of a lower state court "should be 'attributed some weight * * * the decision [is] not controlling * * *' where the highest court of the State has not spoken on the point. * * * Thus, under some conditions, federal authority may not be bound even by an intermediate state appellate court ruling." *C.I.R. v. Bosch's Estate*, 387 U.S. 456, 465, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967); *see also CTI/DC, Inc. v. Selective In. Co. of America*, 392 F.3d 114, 118 (4th Cir.2004) (noting the obligation of a court sitting in diversity to interpret the law in accordance with the state's highest court, or where the law is unclear, as it appears that the state's highest court would rule); 19 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure: Jurisdiction* 2d § 4507 (1996). Nevertheless, a federal court is obliged to give due regard to the decisions of the state intermediate appellate court as an indication of how the state's highest court would decide the issue.[16] *In re Wallace and Gale Co.*, 385 F.3d 820, 830–31 (4th Cir.2004). This Court then must predict how the Maryland Court of Appeals would decide the issue by considering "restate-

---

**15.** In an earlier decision, the Court of Special Appeals recognized the crime-fraud exception to the accountant-client privilege. *Dixon v. Bennett*, 72 Md.App. 620, 531 A.2d 1318 (1987). The appellant had claimed that a third party had made fraudulent transfers to the appellee and the appellant sought production of documents related to the transactions. The court held "[t]he rationale supporting the Federal repudiation of the attorney-client privilege under fraudulent circumstances is equally persuasive when applied to the accountant-client privilege. Communication between an accountant and a client in furtherance of fraudulent or unlawful ends in no way serves to promote informed and intelligent financial advice." *Id.* at 640, 531 A.2d at 1328. In reaching its decision, the court noted that "[f]ederal courts have frequently held that communications that would other-

wise be protected by the attorney-client privilege are not protected if they involve client communications in furtherance of contemplated or ongoing criminal or fraudulent conduct." *Id.* at 639, 531 A.2d at 1327–28.

**16.** This Court has the highest regard for the Court of Special Appeals and its decisions. However, over the past year, for example, the Maryland Court of Appeals reversed a high percentage of Court of Special Appeals decisions before it—between forty and fifty percent. 2003–2004 MD. JUDICIARY ANN. REP. COA–7. This high reversal rate necessarily suggests that this Court cannot rely on Court of Special Appeals' decisions as a predictor of Court of Appeals' decisions, particularly where, as here, the opinion did not engage in a discussion of the legal underpinnings of its decision.

ments of the law, treatises and well considered dicta." *Private Mortg. Inv. Servs., Inc. v. Hotel and Club Assocs., Inc.,* 296 F.3d 308, 312 (4th Cir.2002). Thus, although Fraidin is instructive, the Court is not bound by its bare rejection of the application of the crime-fraud exception to the attorney-client privilege, beyond its literal terms. Moreover, there has been considerable development of the law since the *Fraidin* decision, and the undeniable trend in the law has been to apply the exception more expansively, along the lines first suggested by Wigmore in his seminal treatise on evidence.

The authors of the Restatement recognized the unsettled and developing nature of the law in this area.

> The evidence codes and judicial decisions are divided on the questions of extending the exception to other wrongs such as intentional torts, which, although not criminal or fraudulent, have hallmarks of clear illegality and the threat of serious harm. Legislatures and courts classify illegal acts as crimes and frauds for purposes and policies different from those defining the scope of the privilege. Thus, limiting the exception to crimes and frauds produces an exception narrower than principle and policy would otherwise indicate. Nonetheless, the prevailing view limits the exception to crimes and frauds. The actual instances in which a broader exception might apply are probably few and isolated, and it would be difficult to formulate a broader exception that is not objectionably vague.

Restatement (Third) Law Governing Law. § 82 cmt. d. Clearly, the Restatement view

recognizes the benefit of expanding the crime-fraud exception in certain circumstances while acknowledging that some authorities would construe it narrowly. Indeed, the Reporter's Note indicates that "[t]he authorities disagree whether the exception should include more than crimes and frauds." However, for purposes of a general rule, the Restatement confines section 82 to crimes and frauds because of the inherent difficulty in "formulat[ing] a broader exception that is not objectionably vague." Thus, the Restatement does not outrightly reject expanding outside the traditional notions of crime or fraud; however, it recognizes that such an expansion should be on a factual, case-by-case basis and is not easily codified into language suitable for purposes of the Restatement.

While the comment to the Restatement section indicated that the "prevailing view limits the exception to crimes and frauds," *id.;* this conclusion reached in 2000 does not appear to be the case, at least in 2005.[17]

In fact, numerous authorities support expanding the crime-fraud exception to include other types of wrongful conduct beyond the traditional notions of crime and fraud. One esteemed commentator has outrightly supported extension of the exception, noting any distinction between crimes and frauds and other wrongdoings as an "overly crude boundary" and questioning why the law would protect "a deliberate plan to oust another of their rights, whatever the precise nature of those rights may be." 8 Wigmore, *Evidence* § 2298 (McNaughton rev. ed.1961). *See* 6 Lynn McLain, *Maryland Practice* § 503.10 (2d. ed. 2001) ("Under the same reasoning,

---

**17.** The Reporter's Note to "comment d" lists substantial authority in favor of an expanded crime-fraud exception and then notes several model and state evidence codes that limit the exception to only crimes and frauds. The Court believes that, on balance, the authority

in favor of a limited exception is not substantial enough to support the conclusion that it is the prevailing view, at least as of 2005. Restatement (Third) Law Governing Law. § 82 cmt. d.

communications in furtherance of the ongoing or future commission of intentional torts should be held not to be privileged.") *See also* Gergacz, *Attorney–Corporate Client Privilege* § 4.12 (3d ed.2005) (promoting three-part, policy-based analysis and an expanded version of the exception to limit "clear abuses of the attorney-client relationship"); Greenwald et al., *Testimonial Privileges* § 1.47 n. 5 (3d ed.2005) ("the inclusion of prospective torts in the formula has much support in commentary and in the case law"); Rice, *Attorney–Client Privilege in the United States* § 8.11 (2d ed.1999) (recognizing an expanded version of the exception as logical) (quoting Wigmore). Moreover, other commentary has recorded the trend of a more inclusive crime-fraud exception. *See* Epstein, *The Attorney–Client Privilege and the Work Product Doctrine* 454 (4th ed.2001) ("there is no doubt that courts are recognizing a wider range of improper behavior that will [vitiate the availability of the attorney-client privilege]"); 3 McLaughlin, *Weinstein's Federal Evidence* § 503.30 (2d ed.2005) (noting the modern trend of broader disclosure and extensive exceptions to the privilege); 24 Charles A. Wright & Kenneth W. Graham, *Federal Practice & Procedure: Evidence* § 5501 (1986) (identifying the expansion of the extension as including torts other than fraud).

A survey of case law demonstrates judicial willingness to expand the exception to the kind of conduct alleged here. *See Rambus, Inc. v. Infineon Technologies AG,* 222 F.R.D. 280, 288–89 (E.D.Va.2004) (". . . other courts, when confronted with a variety of untoward conduct, have concluded that the exception is not confined to circumstances of crime or fraud."); *Cleveland Hair Clinic, Inc. v. Puig,* 968 F.Supp. 1227, 1241 (N.D.Ill.1996) (extending crime-fraud exception to bad faith litigation misconduct); *Cooksey v. Hilton Int'l Co.,* 863 F.Supp. 150, 151 (S.D.N.Y.1994) (finding

that "intentional torts moored in fraud can trigger the crime-fraud exception"); *Horizon of Hope Ministry v. Clark County, Ohio,* 115 F.R.D. 1, 5 (S.D.Ohio 1986) (extending crime-fraud exception to torts generally) (citing *In Re Sealed Case,* 737 F.2d 94, 99 (D.C.Cir.1984); *In Re Grand Jury Proceedings,* 727 F.2d 1352, 1355 (4th Cir. 1984); *In Re Grand Jury Proceedings,* 689 F.2d 1351, 1352 (11th Cir.1982)); *United Services Auto. Ass'n v. Werley,* 526 P.2d 28, 31 (Alaska 1974) (noting that privilege will not apply when actions are in furtherance of a crime or "other evil enterprise in concert with the attorney"); *Fellerman v. Bradley,* 99 N.J. 493, 493 A.2d 1239, 1245 (1985) (reading "fraud" expansively and "not limited to conventional notions of tortious fraud" so as to include "fraud upon the court"); *Volcanic Gardens Mgmt. Co., Inc. v. Paxson,* 847 S.W.2d 343, 348 (Tex. Ct.App.1993) (holding that fraud within meaning of crime-fraud exception to attorney-client privilege is broader than common law or criminal fraud and includes commission or attempted commission of fraud on the court or on a third person).

As mentioned previously, plaintiff claims that the defendants conspired with their in-house counsel to deprive him of the full value of his stock by fabricating a story about his resignation. If true, the conduct in the instant case would fall within the expanded definition of the crime-fraud exception.

The Court is persuaded that the policies underlying the attorney-client privilege would not support the protection of communications in furtherance of "the injurious conduct or fraud" alleged by the plaintiffs. In the absence of the Maryland Court of Appeals authority on point and the trend toward an expansion of the exception, this Court finds the tortious interference alleged here which the trial judge has described as employing "injurious fal-

sehood or fraud" does qualify for the crime-fraud exception. This ruling does not, of course, turn Count III into a fraud claim, but does blur—indeed obliterate—the distinction for purposes of applicability of the crime-fraud exception as courts focus on the conduct alleged, not the labels given it.[18]

### c. Application of the Crime–Fraud Exception Here

### i. Principles Governing In–Camera Review of Withheld Documents

Next, the Court must determine if plaintiffs have met their burden for the crime-fraud exception to apply.

█ In order to make this showing, the plaintiffs have asked for *in camera* review of the documents related to the allegedly privileged communications between defendants and their in-house counsel. Because *in camera* review should only be employed "when justified" or "in appropriate cases," *United States v. Zolin*, 491 U.S. 554, 572, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989), the Court requires a "factual basis adequate to support a good faith belief by a reasonable person, that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies." *Id.* (internal citation omitted). Once plaintiffs make this showing, then it is within the discretion of the Court whether to allow *in camera* review.

Based on the arguments and exhibits provided to the Court, plaintiff has satisfied this initial burden as stated by the Court at the June 2, 2005 hearing. Particularly compelling were several documents produced to plaintiffs in redacted form that indicate the termination of Koch was under serious consideration prior to the March 5, 2004 meeting.

For example, Rob Webb forwarded an E-mail from Tim Koch to Migliori, Wichmann, and Mikan on March 3, 2004, adding "I think we should seriously consider lining up a locksmith to spend some time in Lutherville on Friday while we have the Koch family here in [Minnesota]." (Paper No. 39 Mot. Ex. 18.) The same day, Webb forwarded another E-mail from Tim Koch to the human resources department, writing "I find this response to be highly insubordinate. What do we need to do next. I want to escalate all this." (*Id.* Ex. 20.) Plaintiffs also offer the deposition testimony of a former URN employee who had conversed with Webb about Webb's allegedly intense dislike for Koch and his desire to be rid of him by the end of the first quarter of 2004. (*Id.* Ex. 6 at 52:17–22.)[19]

Individually, these documents might not indicate any sinister or wrongful intent on the part of the defendants. However, together they indicate a hostile attitude toward Koch and a gathering plan to terminate him, in spite of what defendants suggest. The documentation insinuates

---

**18.** Plaintiffs have also charged defendants with perpetrating a "fraud upon the court" which fraud they argue also deprives otherwise privileged attorney-client communications of their protection. In light of the ruling above, the Court declines to reach this alternate basis.

**19.** Also, plaintiffs rely on a declaration by Koch based on a document that, as discussed below, is privileged. The initial factual showing cannot be demonstrated by relying on privileged evidence, *Zolin*, 491 U.S. at 574,

109 S.Ct. 2619, and the Court does not believe plaintiffs can get around this constraint by offering a declaration based on a privileged document.

Further, plaintiffs suggest that documents listed on the privilege log indicate a conspiracy existed among the defendants to terminate Koch and to evade payment for the full value of his stock. These conclusory suppositions do not, as a matter of law, constitute a factual basis that would allow the Court to review the documents *in camera*.

that defendants could have been engaging in a plan to rid SCS of Koch. As such, the Court concludes that plaintiffs have demonstrated an adequate factual basis to support the good faith belief that *in camera* review of the documents withheld by the defendants on the basis of privilege might reveal evidence to establish the crime-fraud exception, depriving otherwise privileged documents of their protection.

ii The Burden of Proof Necessary for the Application of the Crime–Fraud Exception to the Facts Alleged Here.

█ In order for the crime-fraud exception to apply, it is not necessary, of course, for the Court to find that the "injurious falsehood or fraud" indeed occurred. The Court does not reach the ultimate issue at this juncture. Rather, after a party challenging the privilege succeeds in its request for *in camera* review, the party must make a prima facie showing that the crime-fraud exception applies. "To drive the privilege away, there must be 'something to give color to the charge;' there must be 'prima facie evidence that has some foundation in fact'." *Clark v. United States*, 289 U.S. 1, 15, 53 S.Ct. 465, 77 L.Ed. 993 (1933). The academic and judicial pronouncements concerning sufficient proof necessary to establish a prima face showing are somewhat inconsistent. Rice, *supra* § 8.6. In *United States v. Zolin*, the Supreme Court noted that following *Clark* some confusion existed surrounding the application of the prima facie burden, but it declined to address the issue at that time. *United States v. Zolin*, 491 U.S.

554, 564 n. 7, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989). Following *Zolin*, while it is clear that mere allegations of fraud or crimes are not sufficient to overcome the privilege, *Burlington Industries v. Exxon Corp.*, 65 F.R.D. 26, 40 (D.Md.1974), courts continue to disagree regarding the level of proof sufficient to establish prima facie showing.[20]

The majority of federal circuits apply the most stringent test, which requires the party seeking disclosure to present enough evidence to support a verdict in favor of the party making the claim.[21] *See Duplan Corp. v. Deering Milliken, Inc.*, 540 F.2d 1215, 1220 (4th Cir. 1976)("[W]hile a prima facie showing need not be such as to actually prove the disputed fact, it must be such as to subject the opposing party to the risk of nonpersuasion if the evidence as to the disputed fact is left unrebutted."); *In re Grand Jury Proceedings*, 401 F.3d 247, 251 (4th Cir.2005); *In re International Systems and Controls Corp. Securities Litigation*, 693 F.2d 1235, 1242 (5th Cir.1982)("[E]vidence that will suffice until contradicted by other evidence"); *In re Sealed Case*, 676 F.2d 793, 815 (D.C.Cir.1982) (moving party must proffer "evidence, that if believed by the trier of fact, would establish the elements of some violation that was ongoing or about to be committed"); *Haines v. Liggett*, 975 F.2d 81, 96 (3d Cir.1992) ("[P]arty seeking discovery must present evidence which, if believed by the fact-finder, would be sufficient to support a finding that the elements of the crime-

**20.** Some courts have concluded that the various definitions of prima facie evidence in practice applied the reasonable person standard, regardless of the language used. "As we read the consensus of precedent in the circuits, it is enough to overcome the privilege that there is a reasonable basis to believe that the lawyer's services were used by a client to foster a crime or fraud." *In re*

*Grand Jury Proceedings*, 417 F.3d 18, 23 (1st Cir.2005); *Accord Haines v. Liggett*, 975 F.2d 81, 95 (3d Cir.1992). *See also* Greenwald et al., *supra* § 1.47 ("In practice, these standards may not be very different.").

**21.** The Tenth Circuit has declined to address the issue. *See In re Grand Jury Subpoenas*, 144 F.3d 653, 660 (10th Cir.1998).

fraud exception were met."); *Pfizer Inc. v. Lord,* 456 F.2d 545, 549 (8th Cir.1972) ("[S]ufficient evidence to sustain a finding"); *In re Grand Jury Investigation,* 842 F.2d 1223, 1226–7 (11th Cir.1987)("[S]howing of evidence that, if believed by the trier of fact, would establish the elements of some violation that was ongoing or about to be committed."); *United States v. Chen,* 99 F.3d 1495, 1503 (9th Cir.1996) ("[ R]easonable cause to believe that the attorney's services were utilized in furtherance of the ongoing unlawful scheme ... by submitting evidence that if believed by a jury would establish the elements of an ongoing violation."). "In satisfying this prima facie standard, proof either by a preponderance or beyond a reasonable doubt of the crime or fraud is not required." *In re Grand Jury Proceedings,* 401 F.3d 247, 251 (4th Cir. 2005). Moreover, "[w]hile such a showing may justify a finding in favor of the offering party, it does not necessarily compel such a finding." *Id.*

In comparison, in the Seventh Circuit, the moving party must show enough evidence to require explanation, not enough to support a verdict in favor of the person making the claim. *See United States v. Davis,* 1 F.3d 606, 609 (7th Cir.1993). If the moving party satisfies its burden, the adverse party, who has superior access to the documents and who is in the best position to explain the evidence, has the burden of explanation. *Matter of Feldberg,* 862 F.2d 622, 626 (7th Cir.1988).

Other circuits use a probable cause standard, requiring evidence sufficient for a prudent person to have a reasonable basis to suspect a crime or a fraud has occurred.

*See, e.g. In re John Doe,* 13 F.3d 633, 637 (2d Cir.1994); *In re Antitrust Grand Jury,* 805 F.2d 155, 166 (6th Cir.1986); *In re Grand Jury Proceedings,* 417 F.3d 18, 23 (1st Cir.2005).[22]

The Maryland courts have not spoken definitively on the burden of proof necessary to establish a prima facie showing in this context. In *Newman,* the Court of Appeals declined to "address the burden of proof required to establish that the communication was in furtherance of a future crime or fraud," as it found no evidence in the record that Newman's communications were made in furtherance of a future crime or fraud. *Newman v. State,* 384 Md. 285, 312 n. 6, 863 A.2d 321, 336 n. 6 (2004). The Court of Special Appeals below had articulated the burden essentially quoting the language from the early Supreme Court opinion, but with no further definition of "prima facie." *Newman v. State,* 156 Md.App. 20, 845 A.2d 71 (2003). "To defeat the privilege, the 'State was required to supply evidence sufficient to give color to the charge [that the statements contemplated future criminal or fraudulent acts] and to establish prima facie evidence that it has some foundation in fact.'" *Id.* (*citing Clark v. U.S.,* 289 U.S. 1, 15–16, 53 S.Ct. 465, 77 L.Ed. 993 (1933)). Given the lack of a definitive Maryland ruling, the Court must predict how the Maryland Court of Appeals would decide the issue by considering "restatements of the law, treatises, and well considered dicta."[23] *Private Mortg. Inv. Servs., Inc. v. Hotel and Club Assocs., Inc.,* 296 F.3d 308, 312 (4th Cir.2004). Other relevant sources include the rule adopted by the majority of

---

**22.** Several treatises have recognized the Circuit split without commenting on how the division should be resolved. *See, e.g.* Greenwald et al., *supra* § 1.47; McLaughlin, *supra* § 503.30.

**23.** Even though one court has held in dicta that determining whether prima facie showing of fraud has been made *may* be a procedural question that should be decided under federal law, *Pritchard –Keang Nam,* 751 F.2d 277, 281 n. 4 (8th Cir.1984), no other court has agreed with this position.

courts, 19 Wright, Miller & Cooper, *Federal Practice and Procedure: Jurisdiction* 2d § 4507 (1996); *Phillips v. Glens Falls Ins. Co.*, 288 F.Supp. 151, 155 (S.D.W.Va. 1968), and relevant federal court decisions. *CTI/DC, Inc. v. Selective In. Co. of America*, 392 F.3d 114, 122–3 (4th Cir.2004).

In *Sears, Roebuck & Co. v. Gussin*, 350 Md. 552, 568–9, 714 A.2d 188, 196 (1998), the Maryland Court of Appeals refused to consider whether a crime-fraud exception existed under the accountant-client privilege because the moving party failed to make a prima facie showing of fraud or "a reasonable basis to suspect the perpetration of a fraud." This dicta suggests Maryland adoption of the reasonable basis test. Notably, the commentary to the Restatement (Third) Law Governing Law. § 82 cmt. f. provides that a party challenging the privilege designation "needs to show only a reasonable basis for concluding that the elements of the exception [ ] exist." At least one commentator supports the adoption of a reasonable basis test as it "preserves the privilege from being too readily removed, yet does not strip the exception of its power by making it too difficult to establish." Gergacz, *supra* § 4.15.

While the dicta in *Gussin* suggests that the Maryland Court of Appeals would reject the majority test and follow the Restatement reasonable basis/prima facie test, it is not necessary for this court to predict which test the Maryland Court of Appeals would adopt, as under any of these tests, the plaintiff has produced the requisite prima facie evidence.

■ First, it must be noted that Judge Garbis refused to grant the defendant's motion for summary judgment on Count II for tortious interference. "The Court holds that plaintiff has produced some evidence to support their contention that Migliori and Webb did not believe that Koch had resigned or quit. Plaintiff also has produced evidence that Migliori told Wichmann and Webb told Ryan that Koch had resigned or quit. Moreover, no evidence has been produced that Migliori tried to disavow Wichmann of his conclusion that Koch had quit. The Court finds that Migliori's and Webb's actions raise a factual issue as to whether wrongful means of 'injurious falsehood and fraud' were used to affect Koch's departure from SCS." (Paper No. 58). The Supreme Court has explained that summary judgment is appropriate when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). As discussed *supra*, under the sufficient evidence standard, a party can make a prima facie case by presenting enough evidence to support a verdict in favor of the party making the claim.[24] In short, the standards seem to be two sides of the same coin. If a party defeats a summary judgment, a prima facie showing has been made. *See Freedom Trust v. Chubb Group of Insurance Co.*, 38 F.Supp.2d 1170, 1171 (C.D.Cal.1999) (because the plaintiff's would bear the burden of proof at trial, denial of summary judgment on

---

**24.** Moreover, under both standards, the Court must view the evidence through rose colored glasses, or as would believe the evidence presented. *Compare United States v. Diebold*, 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) (inferences to be drawn from underlying facts contained in materials presented must be viewed in light of most favorable to party opposing motion) *with Haines v. Liggett*, 975 F.2d 81, 95 (3d Cir.1992) ("[P]arty seeking discovery must present evidence which, if believed by the fact-finder, would be sufficient to support a finding that the elements of the crime-fraud exception were met.").

bad faith issue signifies plaintiffs made a prima facie showing of bad faith under the crime-fraud exception). Judge Garbis's decision supports—indeed seems to compel as a matter of law of the case—a finding that there is at minimum factual evidence in the record, sufficient to support a finding of an intentional tort involving fraudulent acts.

As discussed *supra*, certain communications between Webb and/or Migliori suggest a plan to "engineer" Koch's resignation prior to the March 5 meeting. Objectively, the testimony and documentation as to the statements at the March 5 meeting (even the statements of Webb and Migliori as they reported the events) certainly provide a weak reed for the unequivocal assertion of Koch's resignation. The communications and events after the March 5 meeting similarly do not demonstrate a resignation, or even Migliori's understanding that a resignation had occurred from the message left on Koch's message machine. Moreover, other documents reviewed *in camera* again are suggestive of wrongful conduct in the defendants' treatment of Koch—a gap between fact and assertion, between and among the involved parties. Whether ultimately the jury will concluded that Migliori or Webb or others used the "wrongful means of 'injurious falsehood and fraud' ... to affect Koch's departure from SCS", this Court cannot predict. However, this evidence demonstrates, for purposes of the crime-fraud exception, that there is a reasonable basis for concluding[25] or suspecting[26] that a crime or fraud has occurred. Alternatively, this Court believes that this evidence "is such as to subject the opposing party to the

risk of non-persuasion if the evidence as to the disputed fact is left unrebutted," *Duplan Corp.*, 540 F.2d at 1220. Or finally, this Court holds that the evidence presented is enough "to require explanation".[27] Under any of the aforementioned tests, the plaintiffs have produced the requisite prima facie evidence to trigger the crime-fraud exception.

iii. Nature of Relationship Between Wrongful Conduct and Documents Triggering Loss or Privilege.

 After establishing prima facie evidence, the party advocating for the exception then must demonstrate that a sufficient relationship exists between the privileged information and the crime or fraud at issue. Courts have set out different standards to address the sufficiency of the relationship. As discussed below, this Court has concluded that Maryland has adopted the most restrictive of the tests. Accordingly, it is not enough that the privileged communication "closely relate," "clearly relate" or "reasonably relate" to the wrongful conduct, the otherwise privileged communication of the client (and advise of the attorney) must be in furtherance of the wrongful conduct.

Under Maryland law, the moving party must show the privileged information was in furtherance of the crime or fraud established under the first step. *Newman v. State*, 384 Md. 285, 309, 863 A.2d 321, 335 (2004) ("[T]he crime-fraud exception applies in Maryland to exempt communications seeking advice or aid in furtherance of a crime or fraud."). *See also Dixon v. Bennett*, 72 Md.App. 620, 639, 531 A.2d

---

**25.** Restatement (Third) Law Governing Law. § 82 cmt. f.

**26.** *In re John Doe*, 13 F.3d 633, 637 (2d Cir.1994); *In re Antitrust Grand Jury*, 805 F.2d 155, 166 (6th Cir.1986); *In re Grand*

*Jury Proceedings*, 417 F.3d 18, 23 (1st Cir. 2005).

**27.** *United States v. Davis*, 1 F.3d 606, 609 (7th Cir.1993).

1318 (1987) (Noting with approval in dicta that "[f]ederal courts have frequently held that communications that would otherwise be protected by the attorney-client privilege are not protected if they involve client communications in furtherance of contemplated or ongoing criminal of fraudulent conduct."); *United States v. Cohn*, 303 F.Supp.2d 672, 682 (D.Md.2003) (J. Davis) (disputed communications must be made in furtherance of crime or fraud).[28]

Other courts, including the Fourth Circuit, require a finding of a "close relationship to the client's existing or future scheme to commit a crime or fraud." *See, e.g. Chaudhry v. Gallerizzo*, 174 F.3d 394, 403 (4th Cir.1999) (the Court was applying federal common law in this case with only federal claims)[29]; *In re Murphy*, 560 F.2d 326, 338 (8th Cir.1977). In other circuits, the evidence must "clearly relate" or "reasonably relate" to a possible violation. *In re International Systems and Controls Corp. Securities Litigation*, 693 F.2d 1235, 1242–3 (5th Cir.1982).[30] Because Maryland law is at issue, under Rule 501 of the Federal Rules of Evidence, the "in furtherance" standard adopted by the Maryland Court of Appeals necessarily governs.

The phrase "in furtherance" refers to "an act of furthering, helping forward, promotion, advancement, or progress." *Black's Law Dictionary* 608 (5th Ed.1999). Where an attorney undertakes an affirmative action or concealment to advance their client's crime or fraud, courts have found that attorney-client communications and work product in connection therewith fall under the crime-fraud exception. *See, e.g. In re John Doe Corp.*, 675 F.2d 482, 490–1 (2d Cir.1982)(attorney filed internal investigation report which failed to adequately disclose corrupt payments); *In re Grand Jury Proceedings*, 102 F.3d 748, 752 (4th Cir.1996) (bank's attorneys furthered fraud by mischaracterizing information in loan report). Other circumstances where courts have made this finding include when the client and attorney were jointly engaged in the criminal or fraudulent action.

In several opinions, courts have stated that a communication must both be "in furtherance" and that the communication must "reasonably relate" or "clearly relate". *See, e.g. U.S. v. Cohn*, 303 F.Supp.2d 672, 682 (D.Md. 2003); *In re Grand Jury Proceedings*, 401 F.3d 247, 252 (4th Cir.2005); *In re Sealed Case*, 676 F.2d 793, 816 (D.C.Cir.1982). From these cases, it is not clear whether the "in furtherance" and "sufficient relationship" standards are supplementary procedures, indicating that the communications must further the crime or fraud to a sufficient degree, or whether the standards are distinct legal tests. *See In re Grand Jury Proceedings*, 87 F.3d 377, 382 (9th Cir.1996)(upholding requirement that communication both be "in furtherance" and "sufficiently related", because the "in furtherance standard" was not substituted or replaced). Because the Maryland Courts apply the "in furtherance" standard, we need not decide at this time how any of the various "sufficient relationship" modify the "in furtherance standard."

---

**28.** *See also In re Richard Roe*, 68 F.3d 38, 40 (2d Cir.1995); In re *Grand Jury Proceedings*, 87 F.3d 377, 382 (9th Cir.1996); *Haines v. Liggett*, 975 F.2d 81, 95 (3d Cir.1992); *In re Antitrust Grand Jury*, 805 F.2d 155, 164 (6th Cir.1986); *United States v. White*, 887 F.2d 267, 271 (D.C.Cir.1989); *In re Grand Jury Proceedings*, 417 F.3d 18, 22 (1st Cir.2005) ("[C]lient intended to use the attorney in furtherance of a crime or fraud.").

**29.** *But see In re Grand Jury Proceedings*, 102 F.3d 748, 750–1 (4th Cir.1996) ("The attorney-client and work product privileges are lost, however, when a client gives information to the attorneys for the purpose of committing or furthering a crime.") (applying federal common law).

**30.** Some Circuits have declined to specifically address the issue, stating that communication could either be in furtherance or closely related to the action at issue. *See, e.g. In re Grand Jury Subpoenas*, 144 F.3d 653, 660 (10th Cir. 1998); *Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1417 (11th Cir.1994).

*See In re Grand Jury Proceedings,* 33 F.3d 342, 348 (4th Cir.1994) (attorneys involved in creating sham minority contract firms to comply with minority set-aside program). However, "where it is impossible to discern a causal connection or functional relationship between the advice given by the attorney and the criminal actions taken by his client, the act is not in furtherance of the crime." *United States v. Bauer,* 132 F.3d 504, 509–10 (9th Cir.1997). *See also Parkway Gallery Furniture, Inc. v. Kittinger/ Pennsylvania House Group, Inc.,* 116 F.R.D. 46, 53–4 (M.D.N.C.1987) (letter sent three to four years before fraudulent conduct occurred has an insufficient nexus to "show communication in question was made in furtherance of some misconduct.").

▮ Moreover, a communication may be in furtherance of a criminal or fraudulent action even if the attorney never "participated, even unwittingly, in the client's criminal activity. A communication between client and attorney can be 'in furtherance of' the client's criminal conduct even if the attorney does nothing after the communication to assist the client's commission of a crime, and even though the communication turns out not to help (and perhaps even to hinder)." *In re Grand Jury Proceedings,* 87 F.3d 377, 382 (9th Cir.1996). Because the exception applies regardless of whether the crime or fraud is completed, *see, e.g. United States v. Collis,* 128 F.3d 313, 321 (6th Cir.1997), it is enough for the client to interact with counsel with the intention of facilitating or concealing the criminal or fraudulent activity. *In re Richard Roe,* 68 F.3d 38, 40 (2d Cir.1995). *See also United States v. Martin,* 278 F.3d 988, 1001 (9th Cir.2002) ("The exception applies only when there is reasonable cause to believe that the attorney's

services were utilized in furtherance of the ongoing unlawful scheme."). "It is therefore relevant to show that the wrong-doer had set upon a criminal course *before* consulting counsel." *United States v. Jacobs,* 117 F.3d 82, 88 (2d Cir.1997) (sufficient evidence to show client's intended to participate in crime before consulting attorney where client purchased false driver's license and took other affirmative steps prior to the meeting). However, "[i]t is the client's knowledge and intentions that are of paramount concern to the application of the crime-fraud exception; the attorney need know nothing about the client's ongoing or planned illicit activity for the exception to apply." *In re Grand Jury Proceedings,* 102 F.3d 748, 751 (4th Cir.1996).[31]

Merely showing that the communications contain relevant evidence of crime of fraud is insufficient to meet this standard. *See also* Greenwald et al., *supra* § 1.47 ("[A] link must be drawn between the privileged communication and the crime or fraud. The communication must not merely relate to the crime or fraud, it must be in furtherance of it."); Rice, *supra* § 8.13. ("Only the individual documents that a court finds to have been prepared in preparation for, or in furtherance of, fraudulent activity are excepted from the privilege's protections.") *Accord U.S. v. White,* 887 F.2d 267, 271 (D.C.Cir.1989) ("It appears only when the communications between the client and his lawyer further a crime, fraud or other misconduct. It does not suffice that the communications may be related to a crime. To subject the attorney-client communications to disclosure, they must have been made with intent to further an unlawful act.")

▮ When seeking the production of opinion work product under the crime-

---

**31.** The attorney's intent may be at issue when opinion work product is at issue. See discussion *infra.*

fraud exception, the moving party must make an additional showing. Opinion work product "includes or reflects an attorney's thoughts, such as impressions, theories, or conclusions." Examples of opinion work product include attorney notes summarizing meetings are opinion work product as the information contained with the summary may reveal the attorney's thoughts and theories in the litigation. *In re Allen*, 106 F.3d 582, 608 (4th Cir.1997).[32] Even though opinion work product typically "is only discoverable in extraordinary circumstances," courts have refused to protect the work product when the attorney expressly or by conduct forfeits its protection through their unlawful actions. *In re Doe*, 662 F.2d 1073, 1080 (4th Cir.1981). If the moving party makes a prima facie showing that the "attorney in question was aware of or a knowing participant in the criminal conduct," the opinion work product is discoverable under the crime-fraud exception. *In re Grand Jury Proceedings*, 33 F.3d 342, 349 (4th Cir. 1994). If the attorney was not aware of the criminal or fraudulent conduct, the court should redact any opinion work product from the documents at issue. *Id.*[33] Here, plaintiffs' counsel has not taken the position that the attorneys were aware of the fraudulent conduct and at this point, this Court is not prepared to say that the documents establish such knowledge and conscious involvement. Notably, the attorneys did not attend the March 5, 2004 meeting, and like Wichmann were dependent on the attendees' account of the meeting and subsequent communications. Accordingly, there is no factual predicate for forfeiture of the opinion work product privilege under the crime-fraud exception here.

#### iv. Ruling on Withheld Documents Under Governing Law

▉ The privilege log filed by defendants reflected 66 documents withheld on the basis of attorney-client privilege and/or work-product doctrine. At the June 2, 2005 hearing, the Court ordered defendants to provide a copy of the withheld documents for *in camera* review. Each of the documents at issue has been reviewed by the Court. Upon review, a handful of documents sufficiently establish that defendants Webb and Migliori were communicating with counsel in furtherance of wrongdoing that they would not be privileged under the crime-fraud exception. The Court conducted an analysis for each document based on the principles of law discussed herein and has noted its rulings as to each withheld document on the appended privilege log. The Court has determined that 8 out of 66 documents withheld on the basis of privilege are not worthy of that protection. These documents constitute defendants' communications with their counsel to advance their scheme to prevent Koch from receiving his full earn-out upon leaving his post at SCS, by characterizing his actions and statements as a resignation.

---

**32.** Although not explicitly discussed within our Circuit, a draft letter by an attorney may also qualify as opinion work product for similar reasons, if the letter contains relevant facts and opinions about the case. *See, e.g. Eagle Compressors, Inc. v. HEC Liquidating Corp.*, 206 F.R.D. 474, 478–9 (N.D.Ill.2002) (letter from attorney is classic opinion work product as it contains the attorney's mental impressions and legal theories); *Nesse v. Pittman*, 202 F.R.D. 344, 350–1 (D.D.C.2001) (draft response letter from attorney is opinion work product because decision to file or alter letter reflects the attorney's mental thoughts and theories).

**33.** Fact work product is discoverable even if the attorney was not aware of the crime or fraud at the time of the communication. *In re Grand Jury Proceedings*, 401 F.3d 247, 252 (4th Cir.2005).

Document # 12 consists of an E-mail from Webb to Mark O'Sell, a SCS in-house attorney. The communication is dated March 4, 2004, a day before the critical meeting with plaintiffs. Webb forwarded an E-mail in which Koch stated that the meeting scheduled for the following day "may be the time and place to make a different arrangement." Webb opined to O'Sell, "My view is that this is a resignation. By the way, he sent me a resignation E-mail last June. I think we accept his resignation of 3/2/04 and 7/03." The language demonstrates Webb's desire to rid URN of Koch even before the meeting at which operational differences were discussed and suggests a reasonable person could find the e-mail was in furtherance of his fraudulent conduct.

Document # 15 represents Webb's version of some of the conversations at the March 5 meeting and his opinion that Koch resigned, but also that Koch wanted to leave the company with the $6.25 million to which he was entitled under the voluntary termination clause. This is a client communication of Webb which furthers the alleged injurious falsehood or fraud. While work product privilege is also asserted, since the document is factual work product, the crime fraud exception applies.[34]

Document # 63 contains similar notes of the March 5 meeting, by another participant T. Lyle, the actuary of SCS. Defendants assert work product and attorney-client privilege. Since these notes are at best fact work product, if the crime-fraud exception applies, both the attorney-client and fact work product privilege are lost. While these notes contain relevant infor-

mation on what at least one participant believed occurred at the meeting, the communication cannot be said to have "advanced" or "promoted" the alleged wrongful conduct. Thus, unlike document # 5 authored by Webb, this document does not lose its privileged status under the crime-fraud exception.[35]

Document # 20 is an E-mail from Webb to O'Sell. In the e-mail, Webb states that "We need to support Mike with all the facts we have at our disposal ... Let me touch base with Mikan to see what support he is looking for." This could be interpreted as a communication in furtherance of the wrongful conduct. Consequently, an protection by the attorney-client privilege has been waived.

Document # 25 contains handwritten attorney notes by Thad Johnson from a meeting held on March 9, 2004, the day before the letter was sent to Koch. Present at the meeting were Johnson, Webb, Migliori, Jacqueline Moen (in-house counsel), and Tom Murray (CFO of URN).[36] Document # 25 is opinion work product, as the notes contain Johnson's thoughts and opinion about the status of the case. While the notes could be seen as advancing their plan to portray Koch as having resigned. There has been no determination of prima facie showing as Johnson's knowledge of and participation in the fraud, the document is protected from disclosure under the work product privilege.

In document # 26, Thad Johnson follows up from the meeting described in document # 25, soliciting information from Migliori, Webb, and Murray to "back-up

---

**34.** Document ## 53 and 55 (only the first full paragraph) fall within crime-fraud exception for same reasons.

**35.** As discussed *supra,* on its face, the Court finds that this document likely was improperly withheld. If the defendants wish to dispute

the discoverability of the documents, they may do so no later than October 3, 2005.

**36.** Also present at the meeting was individual "DJS" whom the Court cannot determine the identity.

[their] position." Johnson also notes to Mikan that he is preparing a letter to send to Tim "[o]nce we determine which direction we want to go." This language could be viewed as evidence that defendants intended to state Koch resigned if necessary and that they had discussed this intention with Koch. Alternatively, this e-mail suggests that the defendants still hadn't decided whether to effect Koch's separation through taking the position that he had resigned or was terminable for cause, apparently relying on e-mails and other information as to his insubordination, disruptiveness, etc. Moreover, Johnson is taking an affirmative step in this communication, soliciting information for a letter based upon the alleged fraudulent position taken by the defendants. Accordingly, the document's privilege is lost.

Document # 27 contains a communication from Murray to Johnson with a copy to Webb. It is a response to Johnson's request for information in document # 26 and discusses "building the case" against Koch. It contains a forwarded message from Koch that is self-critical about the progress in integrating SRI and URN. While it is not entirely clear whether this information "builds a case" for termination for cause, as opposed to resignation, counsel rather than the Court know its context and can determine its ultimate relevance. But because it is susceptible of an interpretation as furtherance of the tort alleged by Koch and directly relates to the scheme to resign Koch from URN, its privilege is lost.

Document # 33 reflects Migliori's statements to counsel arguably in furtherance of alleged wrongful conduct regarding injurious falsehood or fraud. Thus, the privilege is lost.

Document # 28 contains a letter drafted by Johnson of March 10, 2004. The letter is an affirmative step by Johnson which furthers the alleged fraudulent position of the defendants. Yet, the draft letter contains counsel's thoughts and impressions, the work product protection is not lost.[37]

Document # 3 is a letter drafted by counsel which is an affirmative action in furtherance of the alleged fraud. However, because the document is a draft letter containing counsel's thoughts or opinions, it is opinion work product.[38]

The Court reviewed other documents that were related to the wrongful purpose, but were not actually "communications seeking advice or in aid" in furtherance of the wrongful conduct; thus, these documents remain privileged. For example, in Document # 5, Thad Johnson, Deputy General Counsel, drafted a set of talking points on March 7, 2004 regarding potential responses to Koch's March 7 and March 8 e-mails in order ostensibly to evaluate the potential merits of his claims. Clearly the talking points are relevant to the plaintiffs' case, and contain comments helpful to plaintiffs' theory of a fabricated resignation position. But mere relevance by itself is not enough. Nothing about this document suggests it was tied to or otherwise promoted the attempts by the defendants to falsely portray that Koch voluntarily resigned his position. Instead, the talking points appears to be a typical document prepared by an attorney discussing the options of different actions and the pros and cons of different positions. Thus, Document # 5 is not discoverable under the crime-fraud exception. Moreover, even if the crime-fraud exception applied to forfeit the attorney-client privilege, the document would appear to be opinion work product, not subject to dis-

---

**37.** Documents # 29 and # 30 do not fall within the crime-fraud exception for the same reasons.

**38.** Document # 36 does not fall within the crime-fraud exception for the same reason.

covery in the absence of a prima facie showing of attorney knowledge of the purported wrongful conduct. *See supra.*

There is evidence otherwise arguably protected by attorney-client and work product privileges that demonstrates defendants' (not just Webb and Migliori) desire or even plan to get rid of Koch possibly on a termination for cause basis before and after the March 5 meeting or even after the March 7 and 9 Koch e-mails. While this may show defendants' disposition or motive to interpret incorrectly or even fraudulently Koch's words and actions, it cannot be said that these communications are "in furtherance of the injurious falsehood or fraud." *See* Document ## 6, 7, 13, 14 and 65.

Also, there are documents that suggest that the corporate defendants were considering the legal import and effect of Koch's words and actions, including whether all the circumstances demonstrated the nature of the separation. *See* Documents ## 16 and 17. In addition, documents exist which suggest that prior to the letter of March 10 formally "accepting" his resignation, there was uncertainty as to whether a resignation had occurred, *see* Document ## 5, 19. Some documents even suggest that some attending the meeting did not believe Koch resigned at that time. *See e.g.* # 63. However, as discussed above, the governing law requires more than relevance.

In reviewing all the documents of the crime-fraud exception, in the Court's judgment there were some withheld documents which on their face were improperly withheld, albeit not falling within the crime-fraud exception, specifically document nos. 10, 11, 13, 14, 16, 18, 19, 21, 22, 23, 24, 31, 32 (except for the first full paragraph), 37, 38 (except for the first full paragraph), 42, 43, 44, 46, 47, 48, 49 (except for the first full paragraph), 50 (except for the first full paragraph), 51, 54, 56 (except for fourth full paragraph) 57, 58, 59, 60, 61, 62, 63, 64 and 66. If after review of the governing law in this circuit, which very narrowly defines the privileges, *see Neuberger Berman Real Estate Income Fund, Inc. v. Lola Brown Trust No. 1B,* 230 F.R.D. 398 (D.Md.2005), the defendants wish to dispute the discoverability of these documents, they may do so no later than October 3, 2005. Plaintiffs may have until October 10 to oppose their position. For several of the documents, the Court recognizes some basis may exist for withholding the documents. However, the basis is not clear from the facts presented on the face of the document. For example, # 63, Ted Lyle's notes from the March 5, 2004 meeting, may have been drafted at the request of counsel in anticipation of litigation. Yet, no facts have been presented to support or refute the position.[39]

**39.** Several of the documents appear to be created by employees of the defendant at the request of counsel in anticipation of litigation. Under Federal Rules of Civil Procedure 26(c)(3), attorney work product protects documents or tangible things prepared by or *for* an attorney in preparation for or in anticipation of litigation or for trial. Greenwald et al, *supra* § 2.1. Consequently, documents created by a client (or in the case of a corporation, by the corporation's employees) in anticipation of litigation may be protected under the work-product doctrine. *Duplan Corp. v. Deering Milliken Inc.,* 540 F.2d 1215, 1219 (4th Cir.1976)(upholding attorney work product protection of document drafted by former general house counsel and vice-president of company because "opinion work product immunity now applies equally to lawyers and non-lawyers alike."). *Accord Abbott Laboratories v. Alpha,* 200 F.R.D. 401, 408 (N.D.Ill. 2001); *In re Dayco Corp. Derivative Securities Litigation,* 102 F.R.D. 468, 469 (S.D.Ohio 1984); *Sperling v. City of Kennesaw Dep't,* 202 F.R.D. 325, 327 (N.D.Ga.2001) (narrative prepared by plaintiff at attorney's request for the purpose of responding to interrogatories was protected by the work product doctrine).

In order to allow the parties to present objections to this decision, the Court will place both this opinion and the responsive documents under seal pending the outcome of any appeal in a separate sealing order.

Because of the complexity of these issues, the Court finds that defendants' position was "substantially justified" and the Court declines to award expenses to plaintiffs under Fed.R.Civ.P. 37 for bringing this motion.

### B. Defendants' Motion for a Protective Order and Inadvertent Disclosure

In a related issue, defendants seek a protective order requiring plaintiffs to return an inadvertently produced, allegedly privileged document disclosed to the court and to plaintiffs. (Paper No. 40). The defendants had attached the four-page document with other exhibits to their memorandum in support of their motion for partial summary judgment. (Paper No. 27). Plaintiffs counter by relying on a declaration made by Koch. (Paper No. 42). In the declaration, Koch discloses that he read the document and that the document "is a blueprint for the fraud that the defendants perpetrated against" him. (Paper No. 42 Ex. 1 at 2.) They also request *in camera* review of the documents, relying on the allegations contained in Koch's declaration. (Paper No. 42).[40]

At the outset, the Court points out that this document, listed under Tab # 5 on the revised privilege log, does not qualify for the crime-fraud exception. Even though

language in the document relates to the fraud allegedly perpetrated by defendants against Koch, it was not actually in furtherance of the fraud itself under the test outlined above. Because the privilege is not vitiated by the crime-fraud exception, a discussion of whether privilege was vitiated through inadvertent disclosure is proper.

Courts have interpreted waiver of the attorney-client privilege by inadvertent disclosure in three distinct lines of authority. *See generally* 3 Weinstein & Berger, Weinstein's Fed. Evid. § 503.42[1]-[4] (2d ed.1997). The strict approach holds that once a document is inadvertently disclosed, privilege may never be restored. *In re Grand Jury Investigation,* 142 F.R.D. 276, 278 (M.D.N.C.1992)(*citing International Digital Sys. Corp. v. Digital Equip. Corp.,* 120 F.R.D. 445 (D.Mass.1988)). The second line of cases hold that inadvertent disclosure never waives the privilege. *See, e.g., Mendenhall v. Barber–Greene* Co., 531 F.Supp. 951, 954–55 (N.D.Ill.1982). The third line of cases apply a case-by-case balancing test to determine waiver. *See, e.g., McCafferty's, Inc., v. Bank of Glen Burnie,* 179 F.R.D. 163, 168–169 (D.Md.1998); *In re Grand Jury Investigation,* 142 F.R.D. 276, 278 (M.D.N.C.1992). It appears that Maryland has adopted the third approach.[41]

As such, the Court will weigh the following factors to determine whether defendants inadvertently waived the attor-

---

**40.** Plaintiffs aver that they do not believe the attorney-client privilege was waived based on inadvertent disclosure (but instead due to the crime-fraud exception, discussed above). Nonetheless, the Court will conduct its own analysis of whether defendants waived privilege by disclosing the document to the Court and to the plaintiffs. The crime-fraud exception does not apply to the document at issue here, listed as Tab # 5 on the revised privilege log.

**41.** In *Elkton Care Center Associates Limited Partnership v. Quality Care Management, Inc.,* 145 Md.App. 532, 805 A.2d 1177 (2002), the Court of Special Appeals concluded that the balancing test is consistent with Court of Appeals' precedent. *Id.* at 545, 805 A.2d at 1184. As discussed above, an intermediate appellate court's statements on a point of law not yet ruled upon by the highest state court may be regarded as indicative of the highest court would rule.

ney-client privilege with respect to the four-page document: the reasonableness of the precautions taken to prevent inadvertent disclosure; the number of inadvertent disclosures; the extent of the disclosure; any delay in measures taken to rectify the disclosure; and the overriding interests in justice. *Elkton Care Ctr. Assocs. Ltd. P'ship. v. Quality Care Mgmt., Inc.*, 145 Md.App. 532, 545, 805 A.2d 1177, 1184 (2002); *In re Grand Jury Investigation*, 142 F.R.D. at 278–79 (M.D.N.C. 1992).

 In support of their motion, defendants argue that reasonable precautions were taken to prevent inadvertent disclosure; that the four-page document is not numerically significant in light of the number of documents produced (8,500 pages); the disclosure is not extensive, in that it is only one disclosure rather than many; the defendants took prompt measures to rectify the problem; and plaintiffs have not relied on the document. (Paper No. 40 at 8–17).[42]

At least two of the factors weigh strongly in favor of waiver. First, the measures taken to prevent inadvertent disclosure seem less than diligent. Although defendants argue that the document was stamped with "Privileged & Confidential—Attorney Work Product," counsel for the defendants did not carefully review the documents submitted with their motion for partial summary judgment, which included the document in dispute. Second, the extent of the disclosure was considerable. This document was filed with the Court and therefore became part of the public record, available electronically to any user with court access. This factor alone distin-

guishes this case from situations where a party inadvertently discloses documents in a discovery response.

On the other hand, other factors militate in favor of no waiver. Importantly, this document, only four pages, was not numerically significant in light of the over eight thousand pages produced during discovery. Also, there was no unreasonable delay between the time that defendants' counsel realized its mistake and when they tried to rectify the disclosure. Finally, the interests of justice would be served by ordering the return of the document because plaintiffs have not relied upon its existence. *See F.C. Cycles Int'l, Inc. v. Fila Sport, S.p.A.*, 184 F.R.D. 64, 78 (D.Md.1998) ("Whether fundamental fairness weighs for or against waiver largely depends on the extent of the reliance the party has made on the document, in its case.").

Despite two of the factors weighing in favor of waiver, overall the Court finds that the document was not inadvertently disclosed and grants defendants' motion for a protective order.

Because the plaintiffs' position was "substantially justified," the Court declines to award expenses to defendants in bringing this motion under Fed.R.Civ.P. 37.

C. Plaintiffs' Motion to Compel Responses to Rule 30(b)(6) Deposition Notice

Turning to the final pending motion, plaintiffs ask the Court to compel responses to certain topics contained in their Fed. R.Civ.P. 30(b)(6) deposition notice. (Paper No. 46 Mot.) The defendants resist. (Pa-

---

**42.** Defendants do not provide legal or argumentative substance for their assertion that the work-product doctrine provides protection for their inadvertently disclosed document, perhaps because this argument is not supportable. *United States v. American Tel. &*

*Tel. Co.*, 642 F.2d 1285, 1299 (D.C.Cir.1980) (noting that the key to distinguish attorney-client privilege from work-product doctrine is whether the material was disclosed to an adversary, not whether it was disclosed at all).

per No. 46 Opp.) The Court finds that defendants' arguments are without merit and plaintiffs' motion to compel is granted.

Plaintiffs seek responses to Topics 3, 4, and 5 of their original 30(b)(6) notices. First, plaintiffs seek testimony about "all communications with Maureen Suelau (Suelau) from February 1, 2004 to present related to Plaintiffs, including but not limited to communications with counsel for any Defendants, and all non-privileged communications among URN, SCS, or SRI employees or agents related to the truthfulness or credibility of Maureen Suelau." (Paper No. 46 Mot. at 5, Topic 3.) Plaintiffs also seek testimony as to "any statements by any of the plaintiffs, or any documents created by plaintiffs which you contend are dishonest or intentionally deceptive ... [and] all statements by current or former SRI employees or documents authored by current for former SRI employees related to the alleged resignation of Tim Koch, or which you contend demonstrate dishonesty on the part of any plaintiff." (Paper No. 46 Mot. at 6, Topics 4 & 5.)

Defendants resist Topic 3 on the grounds of undue burden, improper 30(b)(6) topics, privilege, and that the plaintiffs should have deposed Suelau themselves.[43] Plaintiffs counter by admitting that they could have deposed Suelau, but decided that they were not going to call her as a witness as trial. (Paper No. 46 Rep. at 2.) Plaintiffs assert that when the defendants refused to commit to Suelau as a trial witness, they were required to prepare as thought she were a witness for the defense and properly requested Topic 3 responses. (*Id.*)

Defendants resist Topics 4 and 5 on the grounds that they are improper topics for Rule 30(b)(6) depositions. They cite no case law and do not contend that the subject matter is irrelevant.

■■■ Defendants' arguments have no merit. "Plaintiffs must be allowed to develop their own case." *In re Vitamins Antitrust Litigation*, 217 F.R.D. 229, 233–34 (D.D.C.2002). Fed.R.Civ.P. 26(d) specifically allows "methods of discovery ... used in *any* sequence." (Emphasis added.) "Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party ..." Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence. Fed.R.Civ.P. 26(b)(1). Furthermore, credibility is a proper topic for 30(b)(6) depositions. *In re Vitamins Antitrust Litigation*, 216 F.R.D. 168, 172–73 (D.D.C.2003) (noting that truth and descriptions of agreement and timeliness authored by company employees are proper 30(b)(6) topics); *Hooker v. Norfolk Southern Railway Co.*, 204 F.R.D. 124, 126 (S.D.Ind.2001).

Because the Court does not find that defendants' position opposing discovery of these topics and opposing the plaintiffs' motion to compel "substantially justified and finding that an award of expenses would not contravene the interests of justice," the Court awards plaintiffs their reasonable expenses associated with this motion. Plaintiffs' counsel should submit documentation of its expenses by October 3, 2005, and defendants may have until Oc-

---

**43.** Defendants argue in the alternative; neither argument is meritorious. They argue first that plaintiffs could get the information in a more efficient manner from other employees who have already been deposed; alternatively, they say that plaintiff could have deposed Suelau themselves. To support their position on Topic 3, they cite only *Folwell v. Hernandez*, 210 F.R.D. 169, 175 (M.D.N.C. 2002), which fails to lend their position support, but instead bolsters plaintiffs' arguments for compelling responses.

tober 10, 2005, to oppose any award, or comment on the expenses sought.

Therefore, plaintiffs' motion to compel responses to Rule 30(b)(6) deposition notices is granted.

### III. Conclusion

For the foregoing reasons, the Court GRANTS IN PART the plaintiffs' motion to compel responses to interrogatories and requests for production; GRANTS the defendants' motion for a protective order; and GRANTS plaintiffs' motion to compel responses to their Rule 30(b)(6) deposition notice.